Raymond N. Hannigan (rhannigan@herrick.com)
David Feuerstein (dfeuerstein@herrick.com)
2 Park Avenue
New York, NY 10016
Phone: 212.592.1400
Fax:    212.592.1500
Attorneys for Defendants
Brian Street and James Cohen

**Document Electronically Filed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HSH NORDBANK AG NEW YORK BRANCH, as : Administrative Agent for Itself and Certain Lenders, :

                 : Case No. 08 Civ. 6131 (GEL)

           Plaintiff, :

               :

            vs. :

               : **ANSWER AND**

MICHAEL SWERDLOW, BRIAN STREET, : **AFFIRMATIVE DEFENSES**
and JAMES COHEN, :

               :

           Defendants. :

               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendants Brian Street and James Cohen ("Defendants"), as and for their Answer to the Complaint of the HSH Nordbank AG New York Branch ("Plaintiff" or "HSH Nordbank"), allege as follows:

## **NATURE OF THE ACTION**

1.       Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint except to the extent the allegations purport to refer to the Loan Agreement and other Loan Documents,[1] which are documents that speaks for themselves.   To the extent the allegations in Paragraph 1 are inconsistent with the Loan Agreement and other Loan Documents, those allegations are denied.

2.       Defendants admit that they were principals of Borrower at the time the Loan was made.  The remaining allegations in Paragraph 2 of the Complaint, however, purport to refer to the Completion Costs Guaranty, the Payment Guaranty and the Joinder, all of which are documents that speak for themselves. To the extent the allegations in Paragraph 2 are inconsistent with Completion Costs Guaranty, the Payment Guaranty and the Joinder, those allegations are denied.

3.       Defendants deny the allegations in Paragraph 3 except admit that (a) through the first six months of 2008, due to the actions of Plaintiff plead further in the Affirmative Defenses, numerous construction liens were filed against the Development Project, (b) on April 1, 2008, due to the actions of Plaintiff plead further in the Affirmative Defenses, interest and other payments were not made to Plaintiff, and (c) on or about April 34, 2008, Plaintiff issued a written demand purporting to demand that the entire loan amount of $132,684,433.89, plus all accrued interest and fees, as well as other incurred fees and expenses become immediately due and payable.

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning as set forth in the Complaint.

2

4.     Defendants deny the allegations in Paragraph 4 of the Complaint except to the extent they purport to refer to certain letters dated April 4, 2008, which are documents that speak for themselves.   To the extent the allegations in Paragraph 4 are inconsistent with these April 4, 2008 letters, those allegations are denied.

5.     Defendants deny the allegations contained in Paragraph 5 of the Complaint.

6.     Defendants deny the allegations contained in Paragraph 6 of the Complaint, except admit that by this Complaint, Plaintiff purports to seek to recover all amounts under the Guaranties.

**THE PARTIES**

7.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint.

8.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint.

9.     Defendants admit the allegations contained in Paragraph 9 of the Complaint.

10.     Defendants admit the allegations contained in Paragraph 10 of the Complaint.

3

## JURISDICTION AND VENUE

11.     The allegations contained in Paragraph 11 of the Complaint purport to state a legal conclusion for which no response is required.  To the extent a response in required, Defendants deny the allegations in Paragraph 11 of the Complaint.

12.     Defendants deny the allegations contained in Paragraph 12 of the Complaint, except state that the first and third sentences of Paragraph 12 purport refer to the Guaranties and Loan Documents which are documents that speak for themselves.  To the extent the allegations in the first and third sentences of Paragraph 12 are inconsistent with the Guaranties and/or Loan Documents, those allegations are denied.   In addition, the second sentence in Paragraph 12 purports to state a legal conclusion for which no response is required. To the extent a response in required to the second sentence of Paragraph 12, those allegations are denied.

## STATEMENT OF FACTS

### The Loan Documents

13.     The allegations in Paragraph 13 of the Complaint purport to refer to the Loan Agreement, which is a document that speaks for itself.  To the extent the allegations in Paragraph 13 are inconsistent with the Loan Agreement, those allegations are denied.

14.     The allegations in Paragraph 14 of the Complaint purport to refer to the Loan Agreement, which is a document that speaks for itself.  To the extent the allegations in Paragraph 14 are inconsistent with the Loan Agreement, those allegations are denied.

4

15.    The allegations in Paragraph 15 of the Complaint purport to refer to the Loan Agreement, which is a document that speaks for itself.  To the extent the allegations in Paragraph 15 are inconsistent with the Loan Agreement, those allegations are denied.

16.    The allegations in Paragraph 16 of the Complaint purport to refer to the Loan Agreement, which is a document that speaks for itself.  To the extent the allegations in Paragraph 16  are inconsistent with the Loan Agreement, those allegations are denied.

17.    Defendants deny the allegations in Paragraph 17 of the Complaint except to the extent they purport to refer to the First Renewed Note and Replacement Notes, which are documents that speak for themselves.  To the extent the allegations in Paragraph 17 are inconsistent with the First Renewed Note and/or Replacement Notes, those allegations are denied.

18.    Defendants deny the allegations in Paragraph 18 of the Complaint except to the extent they purport to refer to the Guaranties and Payment Guaranty, which are documents that speak for themselves.  To the extent the allegations in Paragraph 18 are inconsistent with the Guaranties and/or Payment Guaranty, those allegations are denied.

19.    Defendants deny the allegations in Paragraph 19 of the Complaint except to the extent they purport to refer to the Payment Guaranty, which is a document that speaks for itself.  To the extent the allegations in Paragraph 19 are inconsistent with the Payment Guaranty, those allegations are denied.

20.    Defendants deny the allegations in Paragraph 20 of the Complaint except to the extent they purport to refer to the Principal Guaranty, which is a document that speaks for

HF 4312822v.5 #05513/0010

itself.  To the extent the allegations in Paragraph 20 are inconsistent with the Principal Guaranty, those allegations are denied.

21.    Defendants deny the allegations in Paragraph 21 of the Complaint except to the extent they purport to refer to the Loan Documents, which are documents that speaks for themselves.  To the extent the allegations in Paragraph 21 are inconsistent with the Loan Documents, those allegations are denied.

22.    Defendants deny the allegations in Paragraph 22 except deny having knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22.  Defendants further state that the second an third sentences of Paragraph 22 purport to refer to the Loan Agreement and/or letters dated January 22, 2008, March 10, 2008, March 14, 2008 and March 19, 2008, which are documents that speak for themselves.  To the extent the second and third sentences of Paragraph 22 are inconsistent with the Loan Agreement and/or letters dated January 22, 2008, March 10, 2008, March 14, 2008 and March 19, 2008, those allegations are denied.

23.    Defendants deny the allegations in Paragraph 23 of the Complaint except to the extent they purport to refer to an April 3, 2008 notice and the Loan Agreement, which are documents that speak for themselves.  To the extent the allegations in Paragraph 23 are inconsistent with the April 3, 2008 notice and/or Loan Agreement, those allegations are denied.

24.    Defendants deny the allegations in Paragraph 24 except to the extent they purport to refer to the April 3, 2008 notice, which is a document that speaks for itself.  To the extent the allegations in Paragraph 24 are inconsistent with the April 3, 2008 notice, those allegations are denied.

6

25.     Defendants deny the allegations contained in Paragraph 25 of the Complaint except to the extent they purport to refer to certain April 4, 2004 notices which are documents that speak for themselves.   To the extent the allegations in Paragraph 25 are inconsistent with the notices dated April 4, 2004, those allegations are denied.

26.     Defendants deny the allegations in Paragraph 27 except (a) admit that Plaintiff made advances of certain operating expenses for the Development Project, on or about April 9, April 21, May 1, May 27 and June 9, 2008, (b) deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 26, and (c) state that the third sentence of Paragraph 26 purports to refer to the Payment Guaranty, which is a document that speaks for itself.   To the extent the allegations in the third sentence of Paragraph 26 are inconsistent with the Payment Guaranty, those allegations are denied.

27.     Defendants deny the allegations contained in Paragraph 27 of the Complaint, except to the extent they purport to refer to the May 16, 2008 letter, which is a document that speaks for itself.   To the extent the allegations in Paragraph 27 are inconsistent with the May 16, 2008 letter, those allegations are denied.   In addition, Defendants admit that none of the payments have been made under the Guaranties as such payments are not due for all of the reasons set forth in the affirmative defenses alleged herein.

## FIRST CAUSE OF ACTION
### Breach of the Principal Guaranty

28.     Defendants repeat and reallege each of their responses contained in Paragraphs 1 through 27 of the Answer as if fully stated herein.

HF 4312822v.5 #05513/0010

29.     Defendants deny the allegations in Paragraph 29 of the Complaint except to the extent they purport to refer to the Principal Guaranty, which is a document that speaks for itself. To the extent the allegations in Paragraph 29 are inconsistent with the Principal Guaranty, those allegations are denied.

30.     Defendants deny the allegations contained in Paragraph 30 of the Complaint, except admit that Plaintiff, without right, purported to accelerate the balance due on the Loan, the outstanding balance of which was $132,684,433.69, as of the date of purported acceleration.

31.     Defendants deny the allegations in Paragraph 31 of the Complaint except to the extent they purport to refer to the April 4, 2008 notice, which is a document that speaks for itself. To the extent the allegations in Paragraph 31 are inconsistent with the April 4, 2008 notice, those allegations are denied.

32.     Defendants deny the allegations contained in Paragraph 32 of the Complaint, except admit that Guarantors have not paid any portion of the $40 million that Plaintiff claims is due under the terms of the Principal Guaranty since such payments are not due and owing for all of the reasons set forth in affirmative defenses herein.

33.     Defendants deny the allegations contained in Paragraph 33 of the Complaint.

### SECOND CAUSE OF ACTION
### Breach of the Payment Guaranty

34.     Defendants repeat and reallege each of their responses contained in Paragraphs 1 through 33 of the Answer as if fully stated herein.

8

35.    Defendants deny the allegations in Paragraph 35 of the Complaint except to the extent they purport to refer to the Payment Guaranty, which is a document that speaks for itself. To the extent the allegations in Paragraph 35 are inconsistent with the Payment Guaranty, those allegations are denied.

36.    Defendants deny the allegations contained in Paragraph 36 of the Complaint, except admit that as a result of the actions of Plaintiff, as alleged further in the affirmative defenses, Borrower has not paid interest on the Loan in the amount of $626,913.32, together with an administration fee in the amount of $2,500 and a late Payment Fee in the amount of $31,470.67. Defendant further states that such payments are not required for all the reasons set forth in the affirmative defenses herein.

37.    Defendants deny the allegations contained in Paragraph 37 of the Complaint except to the extent they purport to refer to the April 4, 2008 notice, which is a document that speaks for itself. To the extent the allegations in Paragraph 37 are inconsistent with the April 4, 2008 notice, those allegations are denied.

38.    Defendants deny the allegations contained in Paragraph 38 of the Complaint, except admit that Guarantors have not paid any portion of the roughly $660,883.99 amount Plaintiff alleges is due under the terms of the Payment Guaranty. Defendants further state that such payments are not due and owing for all the reasons set forth in the affirmative defenses below.

39.    Defendants deny the allegations contained in the first sentence of Paragraph 39 of the Complaint except admit that Plaintiff, after improperly defaulting the Borrower, may have made certain advances to pay for necessary operating expenses for the

9

Development Project. The allegations in the second sentence of Paragraph 39 purport to refer to the Payment Guaranty, which is a document that speaks for itself. To the extent the allegations in the second sentence of Paragraph 39 are inconsistent with the Payment Guaranty, those allegations are denied.

40.    Defendants deny the allegations contained in Paragraph 40 of the Complaint.

## FACTS RELEVANT TO ALL AFFIRMATIVE DEFENSES
### Preliminary Statement

41.    The central claim in Plaintiff-Bank's Complaint is that an "Event of Default" was triggered, under the relevant loan documents, when mechanics liens were filed against the mortgaged property here. As the Complaint expressly pleads: "Through the first six months of 2008, numerous construction liens were filed against the Development Project. The filing of these liens and Borrower's failure to discharge them constitutes a default of Borrower's obligations under the operative loan documents." Complaint ¶ 3.

42.    However, as alleged in detail below, the Bank itself caused those very construction liens to be placed against the property and the Bank is accordingly estopped, and otherwise barred, from proceeding in this action, or obtaining the relief herein, since the Bank is itself fully responsible for the very "Event of Default" of which it complains and for which it is seeking recovery against the Defendants, guarantors of the loan here.

43.    As set forth in detail below, towards the end of 2007, the condominium Development Project was nearing completion and there were fully executed contracts of sale in

10

place to sell 319 condominium units, which, if sold, would gross $179 million, an amount sufficient to virtually repay the principal balance of the Loan in full. Defendants, as the then principals of the Borrower, entered into discussions with the Bank concerning funding of the last of the monies available, under the relevant construction loan agreements, so that Borrower (a) could complete the little construction left, (b) obtain certificates of occupancy for the units, and (c) close under those contracts of sale and pay to the Bank the proceeds of those closings, reducing extensively, if not satisfying completely, the Bank's loan.

44.    The Bank explicitly agreed to make those last loan advances, notifying, not only the Borrower and the Defendants that it would make those construction advances, but also, upon information and belief, third-party contractors, laborers and materialmen, supplying labor and materials to the construction project, that those construction advances would be made upon completion of the work.

45.    Based upon the Bank's promises and representations, Defendants caused Borrower to have construction work performed, and materials furnished, to complete the Development Project. Moreover, upon information and belief, based upon the Bank's promises and representations that they would be paid upon the conclusion of their work, contractors performed extensive construction work, and materialmen supplied extensive materials, generating substantial expenses that were to be paid through the Bank's promised advances under the its construction loan.

46.    However, at the last minute – just as construction was nearing completion the Bank, in bad faith, reneged on its earlier promises and assurances and refused to fund the last construction requisitions necessary to pay for that construction work already performed and

HF 4312822v.5 #05513/0010

the materials already delivered.  As a direct and proximate result of those actions by the Bank, unpaid contractors, laborers and materialmen all filed construction (mechanics) liens against the property – the very liens upon which the Bank, in its Complaint, bases its claim for default under the loan agreements.  With those liens filed, the Borrower was unable to close on the sale of condominium units; sales that would have extensively reduced, or have satisfied completely, the very Loan the Bank claims is unpaid and for which the Bank seeks recovery against the Defendants as Guarantors.

47.    In addition, upon information and belief, the Loan has been fully restructured, is presently performing, and was not truly even in "default" on the date this action under the Guaranties was commenced, nor on the date hereof.

48.    As set forth in detail below, at the time that the Bank purported to "accelerate" the Loan, there was a "mezzanine" loan in place through which the equity ownership interest in the Borrower had been pledged to a subsidiary of Cerberus Capital Management, L.P., a multi-billion dollar hedge fund located in New York (the "Cerberus Mezzanine Loan").  At one point in time, after the Bank had refused to fund the last construction advances and had declared a default and improperly accelerated the Loan, Cerberus took action to realize upon its pledged collateral. Accordingly, the equity interest in, and ownership and control over, Borrower were transferred to a Cerberus entity in accordance with the applicable mezzanine loan documents.  Since that time, in or about June 2008, an affiliate of Cerberus has owned and unilaterally controlled the Borrower.

49.    Upon information and belief, sometime before, or just after, taking control of Borrower, Cerberus entered into negotiations with the Bank concerning the Development

12

Project and the Loan and Cerberus and the Bank thereafter executed some form of agreement (the "Restructuring Agreement") to which Guarantors have neither consented, nor agreed; a Restructuring Agreement which has been, until this day, improperly hidden from Defendants-guarantors, sureties of the Loan protected under applicable suretyship law.

50.     That Restructuring Agreement was made between two large and powerful financial institutions – HSH Nordbank, one of the largest banks in Europe, headquartered in Hamburg, Germany (indeed, 35.5% owned by the City State of Hamburg), and Cerberus, a massive New York hedge fund – each with billions of dollars in assets. Upon information and belief, the agreement reached between Cerberus and the Bank essentially "cured" all purported defaults, restructured the Loan in its entirety, and rendered the supposedly "defaulted" Loan "performing" in every respect that matters. That is, there exists no real or substantial "default" under the Loan, since, pursuant to this *sub rosa* agreement, between these financial colossuses, the Loan was restructured and made a performing loan.

51.     Yet, notwithstanding that the Loan has been fully restructured and is performing – and that the ultimate payment of the Loan is backed by approximately $150 to $230 million in Florida real property, and has a billion dollar hedge fund as its true borrower – the Bank (upon information and belief, at the urging and behest of Cerberus), has commenced this action in New York against the Defendants (mere secondary obligors) where there is no real and subsisting default under the primary Loan obligation for which they are purportedly secondarily liable. On that basis alone, this action is, at the very least, premature, and should be dismissed.

HF 4312822v.5 #05513/0010

a)    **With the Development Project Virtually Complete,**
      **The Bank Promises and Agrees to Make The Final Construction Advances**

52.    In or around the Fall, of 2007, Borrower (then essentially controlled by Defendants Street and Cohen) had virtually completed the Development Project. In fact, the Development Project already had been granted a temporary certificate of occupancy on or about September 2007.

53.    At or around the same time, the Borrower (a) had entered into contracts to sell 319 condominium units, which, if closed, would gross $179 million, (b) had deposited more than $35 million worth of deposits from condominium sales into escrow, and (c) had made clear to the Bank that funds available under the Loan Documents were necessary to complete the Development Project and to pay its contractors and laborers in full.

54.    Pursuant to the Loan agreements and applicable law, the Bank had a duty to deal with the Borrower, with Defendants and with the Development Project, in good faith and in accordance with Borrower's and Defendants' reasonable expectations that the Bank would make the remaining necessary advances to complete the Development Project, so that the contracts to sell the 319 condominium units could be closed.

55.    Completing the project and closing on the units as quickly as possible was crucial since the Florida real estate market, while still vibrant at that time, was starting to weaken. It was accordingly important to have the Bank make the advances so that the closings could proceed while the real estate cycle in Florida was still positive. Indeed, Defendants here explicitly warned the Bank that time was of the essence in closing the sales, as many of the condominium buyers were holding mortgage commitments that would expire.

14

56.     However, at or about that time, during this late period in the cycle of the Development Project, the Bank was already improperly resisting continuing to fund the remaining, minimum amounts, needed to fund the remainder of the Development Project.

57.     Again, at this time, in the Fall, of 2007, the Development Project was nearly complete, and Borrower needed only about $18 million to finish construction and pay its contractors in full (that $18 million constituting a mere 8% of the full $227 million cost of the Development Project).

58.     Upon information and belief, the Bank was fully aware of all of these crucial facts.  Either through communications with Borrower/Defendants, or through its own inspectors (who were on-site at the Development Project), the Bank was acutely aware of: (a) the minimal construction work Borrower would have to undertake to complete the Development Project, (b) the limited funds from the construction Loan that would have to be advanced to complete that remaining work, and (c) exactly when the closings on certain of the 319 were scheduled to occur and the net proceeds that would be made available from those closings to pay down the Loan.

59.     Notwithstanding its awareness of those critical facts, at this late time the Bank suddenly – and contrary to the Bank's obligations, its written and verbal assurances, and the Borrower's and Defendants' reasonable expectations – began to resist making the final advances.

60.     The Borrower was accordingly forced to plead with the Bank to make those final advances to enable Borrower (a) to complete the Development Project, (b) to close on the contracts for 319 units, and (c) substantially to repay the debt owed to the Bank.

HF 4312822v.5 #05513/0010

61.    Indeed, upon information and belief, at or around the same time that these discussions were occurring, in the Fall, of 2007, the Bank was fully aware that its actions were beginning to put the Development Project into jeopardy.

62.    Upon on information and belief, at that time potential purchasers were already becoming nervous about the Bank's actions and intentions, having learned from their own mortgage lenders that the Bank might be reneging on its obligations to fund the limited amounts necessary, at that late point in time, to complete the Development Project and the condominium units they were about to purchase.

63.    Upon information and belief, as part of an attempt to allay those fears, on or about November 2, 2007, the Bank wrote a letter, for distribution to certain of the purchasers' mortgage lenders, which specifically states that it was being sent by the Bank in "response to various mortgage company's [sic] inquiries regarding the funds necessary to complete the construction" of the Development Project.

64.    In that letter – one of a variety of material representations and promises that the Bank would make to third-parties during this period – the Bank unequivocally promised and represented to the those lenders, and accordingly to the condominium purchasers, that "AT [sic] this time, HSH Nordbank is not aware of any cost overruns or loan violations that would cause the bank to limit or curtail the advances scheduled in the loan agreement and *necessary to complete the development.*" November 11, 2007, Letter from HSH Nordbank (per R. Mathes) to Holly Hill I Associates, Ltd. (emphasis added).

65.    Upon information and belief, the Bank was well aware that this letter, containing those material representations, promises and assurances, would be forwarded to

16

numerous mortgage companies for the unit purchasers, including, for example, Wells Fargo Home Mortgage and JPMorgan Chase Bank.

66.    Indeed, at that time, in or prior to December 14, 2007, the Bank was making these very same representations, promises and assurances to Borrower and to Defendants (who controlled Borrower at that time). That is, at or about that time, in December of 2007, the Bank was representing, promising and assuring Borrower and Defendants that the Bank – in accordance with its obligation to do so and in accordance with Borrower's and Defendants' reasonable expectations – would continue to fund the Development Project through at least February 12, 2008, *i.e.,* the date Borrower and Defendants anticipated that the Development Project would be fully completed and closings could continue.

67.    Indeed, the Bank's November 11th letter from Mathes is just one example of such promises; while intended to be forwarded to unit purchasers' lenders, that letter was of course addressed directly to Borrower and thus a direct promise and assurance to *Borrower* that the Bank would continue to advance all funds necessary "*to complete the development.*"

68.    Moreover, at or about this time, upon information and belief, the Bank became aware that the contractors, laborers and materialmen, constructing the Development Project and supplying necessary materials, were also becoming nervous about the Bank's willingness to make the required final advances under the Loan.

69.    Upon information and belief, the Bank's authorized on-site representatives, and others, represented, promised and assured, or otherwise indicated to those contractors, laborers and materialmen, that the Bank would make the final advances necessary to complete the Development Project, thus inducing those contractors, laborers and materialmen to

17

continue to work on the Development Project and to generate extensive expenses, for which they expected to be paid through the Loan advances promised by the Bank. Upon information and belief, but for the Bank's promises and assurances, those contractors, laborers and materialmen would not have continued to work on the Development Project.

70.     Upon information and belief, at this time the Bank was well aware that, if the contractors, laborers and materialmen continued to supply services and materials and were not thereafter paid, through the promised Bank advances, then those contractors, laborers and materialmen would surely file construction (mechanics) liens against the property.     Indeed, Borrower (through Defendant Street and others) made this exact point to the Bank's key personnel.

71.     That is, while the Loan Documents may refer to an "Event of Default" for the filing of construction (mechanics) liens against the property, at that point and time and otherwise, upon information and belief, the Bank was well aware that the filing of such liens, and hence of the triggering of default under the Loan documents, was wholly within the Bank's own power and control.

72.     The Bank confirmed these promises and assurances, to make the final Loan advances, in writing on January 3, 2008, when it again wrote Borrower (then controlled by Defendants) and confirmed that the Bank then intended to make the final construction advances through approximately February 12, 2008, the date that Borrower anticipated the project would be completed. January 3, 2008, letter from HSH Nordbank (per Messrs. Meyer and Carter) to Borrower.

18

73.    The Bank, consistent with these promises and assurances – and consistent with the Bank's obligation to do so, and with Borrower's and Defendants' reasonable expectations, and with the reasonable expectations of the unit owners, their lenders, and the contractors, laborers and materialmen – funded two separate requests for advances, in December of 2007 and in January of 2008.

74.    At or about that time, the Bank was continuing to resist its obligations to make these last advances, asserting that it had no obligation to advance monies after December 14, 2007. Through these later advances, the Bank expressly waived any such time limitation and otherwise acknowledged that its was obligated to make those final advances, to complete these final steps of Development Project, so as to comply with its obligations and to meet the Borrower's and Defendants' reasonable expectations that the Bank would not pull funding at the very last minute and place the purchase contracts, and the entire Development Project, into jeopardy.

75.    Moreover, the Borrower (then controlled by Defendants), as well as the contractors, laborers and materialmen, all reasonably relied upon the Bank's promises and assurances that it would make those final Loan advances, particularly at that late stage of the project.

b)    **The Bank Reneges On Its Promise to Fund The Third And Final Advance**

76.    In December of 2007 and January of 2008, contractors, laborers and materialmen continued to complete the final work necessary to finish the Development Project. During that time, those contractors, laborers and materialmen were generating invoices and

19

payment requisitions, for which they reasonably expected to be paid through the next advance of the Loan to be made by the Bank.

77.    Extensive progress was made during that period and the Development Project was nearing completion towards the end of January.  Very little additional work was necessary for the Development Project to be completed, so as to allow the unit sales to proceed and thereby to have the Loan paid down, or paid off completely.

78.    Indeed, the Borrower had already started closing on units sales in September 2007, and by late January 2008, had closed on 70 units with gross sales in excess of $38 million.

79.    On or about January 29, 2008, Borrower submitted to the Bank a third requisition for a loan advance, this time for approximately $8 million (the "January 29th Requisition").  The Borrower and Defendants (and others) reasonably expected the Bank timely to pay this last advance, since, *inter alia*, the Development Project was virtually 100% complete.

80.    Indeed, approximately $5 million of the January 29th Requisition was merely to pay the "retainage" owed to the contractors, laborers and materialmen – that is, to pay for work completed long ago that the Bank had already approved and had even paid for.

81.    As is customary with construction contracts, the owner will hold back, from every request for payment, some small percentage of the payment due to the contractors as "retainage" – using that money to create a fund which will be paid to the contractor at the very end of the job.  "Retainage" is built into the contract so as to motivate the contractors to continue

HF 4312822v.5 #05513/0010

to work on, and complete, the job. Here, that "reatainage" was approximately 5% of every payment made.

82.     That is to say that the $5 million sought, as part of the January 29th Requisition, was for work performed by contractors long before – indeed, work that the Bank had fully approved and for which the Bank had already paid 95 cents on each dollar of work. The contractors, laborers and materialmen all fully expected that $5 million to be paid, because they had already been paid for that work by the Bank, and the job was now complete and they were entitled to their 5% retainage.

83.     Only $3 million, of that $8 million sought in the January 29th Requisition, was for any truly new work that had more recently been completed by contractors, laborers and materialmen. That is to say, this final requisition, submitted by the Borrower, was a request for only the last $3 million or so of the Bank's original $179 million loan, an infinitesimal percentage of that total Loan.

84.     Given the magnitude of the Development Project, its almost full completion, and the fact that Borrower had already closed on $38 million worth of unit sales (and reasonably believed they would close on another $45 million worth of units within 30 to 45 days and another 162 units, worth $96 million, shortly after that), Borrower and Defendants reasonably expected that the Bank would comply with the January 29th Requisition and pay it promptly, as it was required to do in accordance with Borrower's rights and its reasonable expectations. Indeed, it was unfathomable to Defendants that the Bank would not pay those final minimal amounts, as promised.

HF 4312822v.5 #05513/0010

85.     Moreover, between January 29th and February 12th, the Bank, in accordance with its prior representations, promises and assurances, gave every indication that it was going to fund the January 29th Requisition, as it was required to do.

86.     For example, after Borrower submitted the January 29th Requisition, the Bank sent Bank personnel to inspect the Development Project, to determine whether the work, for which payment was being sought, in fact had been performed.  During the history of the Development Project, the Bank had only made such inspections when it was preparing to fund an advance requisition submitted by the Borrower.

87.     In addition, upon information and belief, the Bank's inspection engineer recommended to the Bank – and advised Borrower directly – that the work had been performed and was satisfactory and that the January 29th Requisition should accordingly be funded (albeit with a small downward adjustment of $300,000).

88.     Finally, in a February 6, 2008 email, the Bank notified Borrower that the January 29th Requisition, in fact, would be funded "three (3) business days" after (a) Borrower fulfilled certain ministerial document requests, made by the Bank, and (b) the Bank checked the title on the Property.  No further conditions were stated, nor should there have been any.

89.     At this time, upon information and belief, the Bank was well aware (a) that Borrower's contractors, laborers and materialmen were continuing to complete the final work for the Development Project, and (b) those contractors, laborers and materialmen were incurring substantial costs, costs that would ultimately have to be paid through the Bank advances, and (c) that, if not so paid, those contractors, laborers and materialmen would place liens on the Development Project.

HF 4312822v.5 #05513/0010

90.     Indeed, the Bank was further well aware that Borrower intended to pay those contractors, laborers and materialmen with the monies sought through the January 29th Requisition – a requisition the Bank had previously given every assurance and indication it would pay in a timely fashion.

91.     Notwithstanding the Bank's February 6th email to the Borrower, indicating that the January 29th Requisition would be paid, upon information and belief, the Bank, internally, was wavering on whether or not to comply with Borrower's due request for an advance made therein.

92.     Indeed, Borrower fully complied with all of the Bank's requirements, respecting ministerial documentation and demonstrating clean title, yet, despite extensive urging by Borrower, the Bank failed to fund the January 29th Requisition within "three business days" after receiving what it had requested from Borrower.

93.     Instead, the Bank left Borrower hanging – and the Development Project in a highly precarious position – notifying Borrower that it would not reach a final decision, on whether to fund the January 29th Requisition, until almost a month later, after a pre-planned February 26, 2008, meeting of the "Bank Group" – the full group of lenders holding an interest in the Loan and for whom the Bank claims to act as "lead" lender.

94.     That "Bank Group" meeting was requested and organized by the Bank (HSH Nordbank), as lead lender.  The Bank (per Michael Carter) directed that the meeting take place at the project site, on February 26, 2008, and further demanded that representatives of Borrower, including defendant Brian Street, attend to address the Development Project.

23

95.    Upon information and belief, during that interval period, the Bank communicated, both orally and in writing, with members of the Bank Group and specifically notified all of the members of the Bank Group that: (a) Borrower's contractors, laborers and materialmen were continuing to complete the final work for the Development Project, (b) those contractors, laborers and materialmen were incurring substantial costs, costs that would ultimately have to be paid through Bank advances, and (c) if the January 29th Requisition was not paid, as Borrower had requested, those contractors, laborers and materialmen would place liens on the Development Project, liens which would trigger an "Event of Default" under the Loan, and otherwise jeopardize the Borrower's ability to close on unit sales.

96.    At that time, in February, of 2008, there were no "Events of Default" extant under the Loan Documents and the Loan would not mature, by its terms, until the end of 2008 (December 18, 2008); that is, had the Bank funded the advance, and allowed the contractors, laborers and materialmen to be paid, the Borrower would have had almost the entire year to close unit sales, bulk sell-off units, or take any other action necessary to pay off the Loan by that maturity date.

97.    At that time, in February, of 2008, the project was on time and essentially complete. In addition to the $8 Million, sought through the January 29th Requisition, no more than approximately $3 million more was needed for the Development Project to be fully completed.

98.    On the morning of February 26th, that "Bank Group" meeting took place at the property (the "Bank Group Meeting"). In attendance were (a) the Bank (HSH Nordbank) as lead lender, and (b) other members of the Bank Group, including several representatives of

24

HF 4312822v.5 #05513/0010

Landesbank Rheinland-Pfalz and others from Germany, and elsewhere in Europe and the U.S., representing Bank of Scotland, Natixis, and KBC Bank NV, and (c) representatives of Borrower, including Defendant, Brian Street, and (d) a representative of the "mezzanine" lender, Cerberus.

99.    During the Bank Group Meeting, Borrower urged the members of the Bank Group to fund the January 29th Requisition, pointing out again, that if the January 29th Requisition was not funded, contractors, laborers and materialmen would lien the project and those liens would place a cloud on title which would block the Borrower's ability to close on unit sales and thereby repay the Loan.

100.    Indeed, Borrower warned the Bank Group that a number of unit purchasers were already seeking to get out of their contracts and that, if liens were placed on the Development Project, the Bank Group (a) would hand those unit purchasers a useful, potentially *bona fide*, excuse not to close, where at that time those purchasers were obligated to do so, and (b) would cause that group of unit owners, refusing to close and demanding to be released from their binding contracts, to grow, thereby jeopardizing the entire Development Project and the Borrower's very ability to repay the Loan.

101.    During the Bank Group Meeting, Borrower addressed numerous questions about the project and the Loan demonstrating to the Bank Group that the Development Project was virtually complete, that sales were occurring, and that numerous other sales were scheduled to occur in the very near future which would extensively pay down the Loan or satisfy the Loan completely.

102.    Indeed, on that date, Borrower's principals gave a tour of the Development Project to the members of the Bank Group and they could each see, with their own

eyes, that the Development Project was essentially complete and that little more needed to be done and few additional monies funded to complete the project.

103.   Notwithstanding that fact, and notwithstanding the Bank's prior promises and assurances to Borrower, to Defendants, and upon information and belief, to contractors, laborers and/or materialmen, that the Bank would make the last advances, and notwithstanding the Bank's and the Bank Group's knowledge that the failure to make those advances would cause liens to be filed on the property, clouding title and thereby jeopardizing unit closing and the existing contracts, the Bank and the Bank Group refused to make the last advance contained in the January 29th Requisition.

104.   Upon information and belief, the Bank and the Bank Group's refusal to fund the January 29th Requisition had nothing whatsoever to do with the validity or the propriety of that requisition, but, rather, related to the Bank and the Bank Group's view of Cerberus, the mezzanine lender, and the ability of the Bank Group to negotiate some transaction with Cerberus later, after the Bank itself caused the default of the Loan.

105.   That is, upon information and belief, the Bank's action, in refusing to fund the January 29th Requisition, was a calculated move designed to force the Borrower into default, where no default existed, so that the Bank and Bank Group could later negotiate with Cerberus, once Cerberus exercised its rights to take the equity ownership of Borrower, and the Defendants herein no longer controlled the Borrower.

106.   The Bank's stated reason, for failing to fund that requisition, was claimed time limitations upon funding within the Loan Documents; yet that reason, upon information and belief, was a mere pretext for the Bank's true motives, which included cutting some deal with

26

Cerberus, a billion dollar hedge fund, after the Defendants were pushed out of control of the Borrower.

107.   After the Bank notified Borrower of its refusal to fund the January 29th Requisition, representatives of Borrower pleaded with the Bank to change its/their mind and make the advance. Again, those representatives of Borrower warned, in writing, that the "failure to fund will create liens and bring all closings to a complete halt." Among other things, the Bank was reminded that there were, at that time, "25 scheduled closings and an additional number being set for closing," closings which would generate proceeds "greater than 150% of the draw" sought in the January 29th Requisition. In fact, the "additional number" of units "being set for closing" was fifty-five (55), and if those units had closed the proceeds would generate greater than 300 to 400 percent of the draw.

108.   Notwithstanding those pleas, and that warning, the Bank still refused to fund the January 29th Requisition, mouthing the same pretext it had in the past, yet, at the same time hinting, in writing, that its true motivations revolved around Cerberus and collateral issues having nothing whatsoever to do with the draw requisition.

109.   The Bank's failure to fund the January 29th Requisition was made in bad faith and in violation of the Borrower's and Defendants' rights, including the Borrower's and Defendants' reasonable expectations that the Bank would not cease funding at the last minute, just as the Development Project neared completion and sales were scheduled.

110.   On or about March 6, 2008, the Bank, through counsel, notified all of the contractors, laborers and materialmen on the Development Project that the Bank was ceasing all

HF 4312822v.5 #05513/0010

funding under the construction loan, thereby advising contractors, laborers and materialmen that they would not be paid for work performed or materials supplied as of that date.

111.    The Bank was well aware that its actions would cause liens to be filed. Indeed, as a direct and proximate result of the Bank's notice, and of the Bank's bad faith refusal to fund the January 29th Requisition, contractors, laborers and materialmen were not paid and those contractors, laborers and materialmen did file liens against the property, totaling over $8 million in all.

112.    On or about March 10, 2008 – a mere four (4) days after notifying the contractors, laborers and materialmen that they would not be paid – the Bank sent a letter to Borrower notifying Borrower of the occurrence of an "Event of Default" under the Loan Documents.

113.    The sole "Event of Default," outlined in that Notice of Default, is the filing of mechanics liens on the Development Project by contractors, laborers and materialmen – liens that went down shortly after the Bank's notice.

114.    Four days after that, on March 14th, the Bank again sent notice of default, once again based upon additional liens; liens that the Bank was undoubtedly aware would be filed on the property. On March 19th, the Bank sent yet another notice of default, based solely upon more liens that had been filed as a proximate result of the Bank's bad faith actions as aforesaid.

115.    At the time the Bank sent those Notices of Default, there were no other extant defaults and the Loan would not mature, by its terms, for nine months more.

HF 4312822v.5 #05513/0010

116. The Bank, in bad faith, manufactured the very defaults it asserted and upon which it relies in this action.

117. But for the Bank's actions, and the filing of those liens caused by the Bank, Borrower would have closed on the scheduled sale of 80 or more condominium units and would have utilized those monies to pay down the Loan and to pay interest and other expenses of the Loan. Additional sales would have been scheduled and would have generated more monies to pay down the Loan or to pay it off completely.

118. On or about April 3, 2008, the Bank sent notice to Borrower purporting to accelerate the full $132,684,433.69 based upon (a) the lien based defaults, which had been engineered by the Bank, as well as (b) claimed payment defaults, which had also been manufactured by the Bank through the Bank's actions in allowing the liens to be filed, thus clouding title and preventing the unit closings from taking place.

119. The Bank's acceleration of the full Loan amount was accordingly made in bad faith.

120. On that same date, the Bank purported to make demand upon the Defendants, as Guarantors under the Guaranties of the Loan, also based upon the Bank's manufactured and bad faith default and acceleration.

121. That demand made upon the Defendants, as Guarantors, was also made in bad faith and the Bank's actions, for those reasons as aforesaid, and otherwise, have released the Defendants from any obligations under the Guaranties.

HF 4312822v.5 #05513/0010

c)    **The Bank and Cerberus Secretly Restructured The Loan And Rendered It Performing**

122.    At all relevant times, the Bank was well aware that the $275 Million Cerberus Mezzanine Loan was in place, through which the equity interest in Borrower (that is the limited liability company membership interest in Borrwer) had been pledged to a subsidiary of Cerberus.

123.    Upon information and belief, at or around the time the Bank was refusing to fund the January 29th Requisition, the Bank was further well aware that the Cerberus Mezzanine Loan was in default and that, at some point in time, a Cerberus entity might take control of the Borrower and thus (a) Defendants here would no longer have any control over the Borrower, and (b) Cerberus, a multi-billion hedge fund, would become the Bank's true borrower, backing the ultimate repayment of the Loan with its vast financial resources.

124.    Upon information and belief, and as plead herein, the Bank's stated reason for refusing to fund the January 29th Requisition was a mere pretext and the Bank's true and actual reason and motivation for refusing to fund that last advance was that the Bank (a) desired to push Defendants Street and Cohen out of any control of the Borrower, and (b) to manipulate the Borrower so that Cerberus would take control of Borrower, thus permitting the Bank, once that happened, to cut a completely new and restructured loan deal with Cerberus.

125.    Upon information and belief, discussions between the Bank and representatives of Cerberus (or its subsidiaries or affiliates) began at, or before, the time of the Bank Group Meeting and included discussions with Cerberus concerning a future deal between the two financial giants.

11F 4312822v.5 #05513/0010

126.    Upon information and belief, Cerberus either actively encouraged the Bank Group and Bank to act as aforesaid, or otherwise, through its silence and its failure to object, indicated to the Bank Group and the Bank that it approved and assented to the Bank's actions in improperly refusing to make the final January 29th Requisition.

127.    At or around the time the Bank was refusing to fund the January 29th Requisition, Cerberus was already seeking to have transferred to it the equity interests in a number of other entities pledged to a Cerberus subsidiary under the Cerberus Mezzanine Loan agreements.  At or about that time, Cerberus indicated, or claimed, that it might not seek the transfer to it of the ownership of the Borrower, or the property at issue here, and that Defendants Street and Cohen might maintain ownership and control of Borrower.

128.    Upon information and belief, before, or at some point after the Plaintiff-Bank purported to accelerate the Loan (based upon the lien based defaults, which the Bank itself created), the Bank entered into direct, secret, negotiations with Cerberus about Cerberus taking over the membership interests in Borrower and pushing Defendants Street and Cohen out of any control of Borrower.

129.    Upon information and belief, during those secret negotiations, the Bank made a particularly attractive offer to Cerberus in order to induce Cerberus to take control of Borrower and to push Defendants Street and Cohen out of any control of Borrower.

130.    Upon information and belief, during those discussions the Bank outlined the terms of an agreement to be entered into with Cerberus once Cerberus took control of Borrower through its claimed rights under the Cerberus Mezzanine Loan.  Upon information and

31

belief, drafts of that proposed agreement were even secretly circulated between the Bank and Cerberus prior to Cerberus taking over the equity in the Borrower.

131.    While the events and details surrounding those negotiations, and the Restructuring Agreement itself, have been hidden from Defendants, upon information and belief, as part of the ultimate deal reached between the Bank and Cerberus, on behalf of the Borrower (a) all claimed "Events of Default" (which had been manufactured by the Bank, in any event,) were essentially forgiven and the slate was wiped clean, (b) the loan was fully restructured, and in all likelihood extended, with the Cerberus entity being given more favorable terms and more time to complete the sales, and to pay off the Loan, than the Bank had ever been willing to permit when Defendants Street and Cohen had some control over the Borrower, and (c) most troubling of all, the Bank agreed that, on behalf of Cerberus, and solely for the benefit of Cerberus, that the Bank would commence this action and pursue Defendants Street and Cohen on their payment Guaranties so as to attempt to extract monies from Street and Cohen to pay down the Loan – monies that would benefit only Cerberus.

132.    Some time after those negotiations had commenced, and a deal had been reached, or was close to being reached between the Bank and Cerberus, Cerberus ultimately requested that Defendants Street and Cohen cause the equity in the Borrower to be voluntarily transferred to a Cerberus affiliate.

133.    Neither the Bank, nor Cerberus, disclosed to Defendants Street and Cohen, at that time, that any deal had been reached, nor any of its terms.  In particular, neither the Bank, nor Cerberus, disclosed to Defendants that the Bank, upon information and belief, intended to seek payment on the Guaranties, including commencing this action.  To the contrary, at or about

32

that time, Cerberus was making representations to Defendants that, if Defendants cooperated in turning over the equity to Cerberus, that Defendants would ultimately bear no liability on their Guaranties.

134. Upon information and belief, the ultimate Restructuring Agreement, entered into between the Bank and Cerberus, contains self-serving statements and verbiage to the effect that the Loan remains in "default" and/or "accelerated," yet this language was included solely to permit the Bank, on behalf of and at the behest of Cerberus, to commence this action on the Guaranties.

135. Upon further information and belief, the Bank's agreement with Cerberus also even addressed – and "cured" – the very construction liens that were placed on the Development Project when the Bank refused to fund the January 29th Requisition, and which the Bank claims created the Event of Default under the Loan Agreement. In fact, upon information and belief, no contractor, laborer or materialman has commenced any action seeking to enforce a construction lien because those liens have all been settled and no longer encumber the Development Project. The only lienor that has not been paid is a company called "Tango," which is related to the Defendants, but which also supplied valuable materials to the Development Project.

136. Upon information and belief, the Loan is not truly in "default" at this point in time, and instead, Plaintiff-Bank is attempting to elevate form over substance with that claim.

137. Upon information and belief, in substance, and in reality, the Loan here has been fully restructured with Cerberus and is a "performing" loan in every sense that matters. Upon information and belief, payments are being made to the Bank, under the restructured Loan,

HF 4312822v.5 #05513/0010

the date for final payment of the balance of all principal and interest has been extended, or remains December 18, 2008, as originally stated in the Loan documents.

138.    At this time, upon information and belief, Borrower is ultimately owned and controlled by Cerberus – a multibillion-dollar hedge fund whose investments include Chrysler, GMAC and Air Canada – and Cerberus is ultimately responsible for payment of the Loan, lest it lose control of the assets.

139.    Additionally, upon information and belief, those valuable real estate assets remain in place as mortgaged security for the Loan. Indeed, shortly after Defendants conveyed their equity in Borrower to Cerberus, a third-party sent to Defendants a "letter of intent" offering an all-cash deal to buy the Development Project for $150 million, *i.e.*, $17 million more than the outstanding principal that was owed when the Bank purported to accelerate the Loan.

140.    That is, upon information and belief, as of the date this action was commenced, the Bank could have recouped all of the outstanding monies due under the Loan by either (i) foreclosing against the collateral, which as discussed above, was worth somewhere between $150 and $230 million, or (ii) sue the Borrower, who was (and is) now owned by an affiliate of a multi-billion dollar hedge fund.

141.    The Bank, however, upon information and belief, at the behest of Cerberus, chose neither option and instead chose to sue Defendants, in their capacities as Guarantors under the Guaranties.

142.    Upon information and belief, the Bank has not sought repayment from the Borrower, or taken action to foreclose the collateral, because the reality and substance of the

34

situation is that all of the feigned lien "defaults" have been "cured" and the Loan, as restructured between the Bank and Cerberus, is a performing loan, and not really in "default" at this point in time (assuming, *arguendo*, it was ever truly in default in the first place).

143.    That is, in addition to the Bank's bad faith actions – in causing the very lien based "default" of which it complains in this action – the Bank is also equitably estopped and barred from continuing this action because the Loan has been fully restructured and is not in default and any claim on the Guaranties are fully premature.

144.    Upon information and belief, the Bank's commencement of this action, in light of those facts, is no more than a sham, a waste of this Court's resources, and further taints the Bank with unclean hands and has released Defendants from any such continuing liability under their Guaranties.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

145.    Defendants repeat and reallege Paragraphs 1 through 144 of this Answer and Affirmative Defenses as if fully set forth herein.

146.    As plead in detail above, the Bank's claims in this action derive from a claimed "Event of Default" under the Loan Documents based upon the filing of construction liens on the property.  Plaintiff HSH Nordbank, itself, manufactured that default through its actions in refusing to fund the last advances under the Loan to complete the project after representing and promising to Borrower, Defendants and others that it would do so.

HF 4312822v.5 #05513/0010

147.   The Borrower, at that time controlled by Defendants, as well as the Defendants themselves, reasonably relied upon the Bank's promises and assurances that it was going to make those final advances.

148.   But for the Bank's actions, no liens would have been filed against the Development Project, contracts to sell would have been closed and proceeds of those sales would have paid the Bank sufficient amounts under the Loan so that the Loan would not have gone into further default and ultimately would have been paid in full.

149.   The Bank has acted in bad faith as aforesaid.

150.   Accordingly, Plaintiff's claims are barred by the doctrine of equitable estoppel and other equitable doctrines.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE
### (Plaintiff's Claims are Not Yet Ripe)

151.   Defendants repeat and reallege Paragraphs 1 through 150 of this Answer and Affirmative Defenses as if fully set forth herein.

152.   As set forth above, the Loan, upon information and belief, was fully restructured when a Cerberus entity took over the equity interest (membership interest) in Borrower.

153.   As part of the Restructuring Agreement, upon information and belief, all feigned lien and other defaults (including those directly caused by the Bank) were "cured," the loan term extended, or not yet reached, and the Loan is performing in every sense that matters.

36

154.    Thus, Plaintiff's claims under the Guaranties are premature, at best, and are not ripe for adjudication and/or Defendants have been fully released from the Guaranties through the Bank's commencement of this action where no colorable claim truly lies.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE
### (*Strictissimi Juris*/Novation)

155.    Defendants repeat and reallege Paragraphs 1 through 154 of this Answer and Affirmative Defenses as if fully set forth herein.

156.    Pursuant to the Guaranties, Defendants guaranteed a specific loan, with specific terms, including a $192 million principal balance, an average interest rate of 7.5%, over a three-year term, and a maturity at the end of that term on December 18, 2008.

157.    As mere sureties and secondary obligors of that Loan, the Defendants' obligations are *strictissimi juris,* in relation to that Loan, and they are accordingly discharged from their Guaranties by any alteration to the Loan for which the Guaranties were made.

158.    Upon information and belief, the Bank and Cerberus, on behalf of Borrower, the primary obligor, entered into the Restructuring Agreement through which they materially modified and amended many of the original terms of the Loan, the primary obligation for which Defendants here are only secondarily liable.

159.    Upon information and belief, key and material terms of the Loan, such as its maturity date, interest rate, and other terms, have been modified and amended and collateral has been released, or compromised, under the terms of that Restructuring Agreement or otherwise.

37

HF 4312822v.5 #05513/0010

160.   Prior to this time, the Bank always sought the signatures of Defendants, who as Guarantors, had to approve any changes to the Loan Documents, no matter how minor the change(s) was. This time, however, the Bank did not seek Defendants' approval.

161.   These modifications have materially prejudiced Defendants, mere sureties of the debt, protected under applicable suretyship law. Moreover, the Bank and Cerberus, by releasing, or otherwise compromising, collateral for the Loan have prejudiced Defendants' subrogation rights to levy upon that collateral in the event Defendants are forced to pay in this action or otherwise under the Guaranties.

162.   Under the settled suretyship doctrine of *strictissimi juris*, and other legal and equitable doctrines, Defendants have been fully released from liability under the Guaranties by virtue of the Bank's modifying and amending the terms of the primary loan obligation, and/or releasing collateral for that loan.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE
### (Fair Market Value Credit of Collateral/Election of Remedies)

163.   Defendants repeat and reallege Paragraphs 1 through 162 of this Answer and Affirmative Defenses as if fully set forth herein.

164.   Upon information and belief, Plaintiff continues to hold a mortgage on the Development Project – mortgaged property which, as of today's date, is worth somewhere between $150 million and $230 million.

165.   Upon information and belief, should Plaintiff not be paid by the Cerberus controlled Borrower, Plaintiff either intends to commence a foreclosure action, a Bankruptcy proceeding, or to take the collateral through other means set forth in the Restructuring

Agreement or otherwise.   Plaintiff is fully secured, indeed, over-secured, and is seeking an improper windfall, double, recovery.

166.    Guarantor is entitled to a credit against any claim or judgment equal to the then fair market value of the mortgaged property.   Alternatively, or in addition, Plaintiff has elected a remedy and is barred under applicable law from continuing this action at law, or any foreclosure action in equity, at the same time.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE
### (Anticipatory Breach/Breach of the Covenant of Good Faith and Fair Dealing)

167.    Defendants repeat and reallege Paragraphs 1 through 166 of this Answer and Affirmative Defenses as if fully set forth herein.

168.    By entering into the Guaranties, Defendants were to be held secondarily liable, for up to $40 million, only in the event the Bank declared a legitimate, not feigned, Event of Default, and could not recoup the full amount of the Loan from the Borrower or the collateral.

169.    As discussed above, the Bank improperly and in bad faith (i) caused the very "Event of Default" of which it complains in this action, (ii) agreed, upon information and belief, with Cerberus to treat the allegedly non-performing loan as performing, and (iii) sued Defendants without taking action against the collateral or Borrower.

170.    In so doing, the Bank has frustrated the intent of Defendants when they entered into the Guaranties and has failed to act in accordance with the covenant of good faith and fair dealing.

HF 4312822v.5 #05513/0010

171.   Such a breach constitutes an anticipatory breach, which excuses Defendants' performance under the Guaranties.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

172.   Defendants repeat and reallege Paragraphs 1 through 171 of this Answer and Affirmative Defenses as if fully set forth herein.

173.   For the reasons set forth above – including the Bank's role in manufacturing the very "Event of Default" upon which it bases this action,  and then suing on the Guaranties before taking action against the mortgaged collateral or the Borrower – the Bank's claims are barred by the doctrine of unclean hands.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE
### (Waiver)

174.   Defendants repeat and reallege Paragraphs 1 through 173 of this Answer and Affirmative Defenses as if fully set forth herein.

175.   For the reasons set forth above – including the Bank's decision to fund two Requisitions after December 14, 2007 – the Bank's claims are barred by the doctrine of waiver.

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE
### (Set Off)

176.   Defendants repeat and reallege Paragraphs 1 through 175 of this Answer and Affirmative Defenses as if fully set forth herein.

HF 4312822v.5 #05513/0010

177.    To the extent Defendants are held liable, they are entitled to set off their damages by virtue of the Bank's actions and/or inactions.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE
### (Lack of Standing/Capacity to Sue)

178.    Defendants repeat and reallege Paragraphs 1 through 177 of this Answer and Affirmative Defenses as if fully set forth herein.

179.    Plaintiff alleges that it brings this Complaint "for itself and other certain lenders".

180.    But for the reasons set forth more fully in the Answer and Affirmative Defenses of Michael Swerdlow (which are incorporated herein by reference), Plaintiff has failed to adequately allege facts – facts which are solely in its control – that establish either the necessary capacity or authority to bring this action as "Administrative Agent" on its behalf and/or on behalf of the Bank Group.

181.    Plaintiff, therefore, lacks standing and/or authority to sue under the Guaranties and its claims should be dismissed.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

182.    Defendants hereby reserve any and all additional, or further, defenses as may be revealed by additional information that may be acquired in discovery or otherwise.

41

WHEREFORE, Defendants respectfully demand judgment dismissing the Complaint in all respects and awarding Defendants such other and further relief as the Court deems just and proper, including but not limited to, Defendants' attorneys' fees and costs in litigating this dispute.

Dated:   New York, New York
         August 29, 2008

                                      HERRICK, FEINSTEIN LLP

                                      By: _____
                                          Raymond N. Hannigan
                                          David Feuerstein
                                      2 Park Avenue
                                      New York, NY 10016
                                      Phone: 212.592.1400
                                      rhannigan@herrick.com
                                      Attorneys for Defendants and Third Party
                                      Plaintiffs Brian Street and James Cohen

HF 4312822v.5 #05513/0010

Raymond N. Hannigan (rhannigan@herrick.com)
David Feuerstein (dfeuerstein@herrick.com)
2 Park Avenue
New York, NY 10016
Phone: 212.592.1400
Fax:   212.592.1500
Attorneys for Defendants Brian Street and James Cohen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HSH NORDBANK AG NEW YORK BRANCH, as  :
Administrative Agent for Itself and Certain Lenders,  :
                                                       : Case No. 08 Civ. 6131 (GEL)
                            Plaintiff,                 :
                                                       :
                 vs.                                   :
                                                       : **AFFIDAVIT OF SERVICE**
MICHAEL SWERDLOW, BRIAN STREET,                        :
and JAMES COHEN,                                       :
                                                       :
                            Defendants.                :
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK    )
                                  ss.:
COUNTY OF NEW YORK    )


        Jarret Hova, being duly sworn, deposes and says:

        That deponent is not a party to the action, is over eighteen years of age and

resides in Jackson Heights, New York.

        That on August 29, 2008, deponent served the Answer of Defendants Brian Street

and James Cohen upon:

        John K. Shubin, Esq.
        Jeffrey S. Bass, Esq.
        Shubin & Bass, P.A.
        46 SW 1st St., 3rd Floor
        Miami, FL 33130
        Attorneys for Defendant Michael Swerdlow

at the above addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in a postpaid, properly addressed wrapper in an official depository under the exclusive care and custody of Federal Express within the State of New York.

_____

Jarret Hova

Sworn to before me, this
29th day of August, 2008

_____
NOTARY PUBLIC

DENORAH RIVERA
Notary Public, State of New York
No. 01RI4738528
Qualified in Orange County
Commission Expires August 31, 2009

2