UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                                   :

HSH NORDBANK AG NEW YORK       :
BRANCH, as Administrative Agent for
Itself and Certain Lenders,            :

                                                   :

                     Plaintiff,    :

                                                 :

   -v-                               :

MICHAEL SWERDLOW et al.,          :

                                                :

                   Defendants.   :
-----------------------------------------------------x



08 Civ. 6131 (GEL)

**OPINION AND ORDER**

Michael H. Barr, Sonnenschein Nath &
Rosenthal LLP, New York, NY <u>for plaintiff</u>.

Raymond N. Hannigan, Herrick, Feinstein
LLP, New York, NY, <u>for defendants Brian
Street and James Cohen</u>.

John Shubin, Shubin & Bass, Miami, FL,
<u>for defendant Michael Swerdlow</u>.

GERARD E. LYNCH, <u>District Judge</u>:

      Plaintiff HSH Nordbank AG New York Branch ("Nordbank"), as administrative agent

for five lenders ("non-party lenders"),[1] brings this breach of contract action against defendants

Michael Swerdlow, Brian Street, and James Cohen, seeking to enforce various guarantees of a

$192 million loan.   By letter dated June 9, 2009, the parties seek judicial resolution of a dispute

that has arisen during the course of discovery.   For the reasons discussed below, Nordbank's

request for relief is granted in part and denied in part.

---

    [1] The non-party lenders are Deutsche Hypothekenbank, Bank of Scotland, Natixis
Banques Populaires, KBC Bank, NV, and LRP Landesbank Rheinland-Pfalz.  (Compl. ¶ 17.)

# BACKGROUND

## I.     The Dispute

The following facts are alleged in the complaint, and/or set forth in the parties' joint letter presenting the discovery dispute.

In December 2005, Nordbank agreed to loan Holly Hill I Associates, Ltd. ("Holly Hill") up to $192 million (the "Loan") for a residential condominium development in Holly Hill, Florida. (Compl. ¶¶ 1, 13.)  Under the terms of the Loan, a "Default" is "any event which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default." (Id. Ex. A, § 1.1, at 10.)  Events of Default, in turn, include Holly Hill's "failure to pay . . . any regularly scheduled installment of principal, interest . . . or other amount due under the Loan Documents . . . on the date when due" (id. § 14.1), and its violation of any of the specific covenants contained in the Loan.  (Id. § 14.5.)

Article 17 of the Loan identifies Nordbank as the Administrative Agent for the non-party lenders and provides:

> In the event that Administrative Agent has such actual knowledge or receives such a notice of the occurrence of a Default or Event of Default, Administrative Agent . . . following consultation with Lenders, shall take such action (or refrain from taking such action) with respect to such Default or Event of Default as it shall deem appropriate and in the best interests of Lenders in Administrative Agent's sole and absolute discretion. . . .  [E]ach of [the] Lenders acknowledges and agrees that no individual Lender may separately enforce or exercise any of the provisions, rights or remedies of or under any of the Loan Documents . . . other than by and through Administrative Agent.

(Id. § 17.16.)  Article 17 further notes:

> Administrative Agent selected, and the other Lenders consented to the selection of, Sonnenschein Nath & Rosenthal LLP as Administrative Agent's counsel for all matters in connection with

2

the Loan, the Project and the transactions contemplated by the
Loan Documents.  If, at any time during the term of the Loan, any
Lender shall decide that its interests have become so divergent
from the interests of the other Lenders or Administrative Agent
that it does not feel it is prudent to be represented by the same
counsel, such Lender may retain, at its sole cost and expense, its
own counsel (but such Lender shall nevertheless remain
responsible for its pro rata share of costs, expenses and liabilities
including with respect to counsel selected by Administrative
Agent)[.]

(Id. § 17.17.)

To support Holly Hill's obligations under the Loan, defendants Swerdlow, Street, and

Cohen, all of whom were principals of Holly Hill at the time the Loan was made, executed

various guaranties in favor of Nordbank.  (Id. ¶¶ 2, 18.)  These guaranties included a Guaranty of

Payment, which jointly and severally guaranteed "full payment when due of all interest on the

Loan," and a Completion Costs Guaranty.[2]  (Id. ¶¶ 2, 19)

In 2006, the Loan was syndicated among Nordbank and the non-party lenders.  (Id. ¶ 1.)

The same year, defendants executed a Principal Guaranty in consideration of certain

amendments to the Loan.  (Id. ¶¶ 2, 20.)  The Principal Guaranty jointly and severally

guaranteed "payment when due . . . of the outstanding principal balance of the Loan" up to $40

million.  (Id.)

As a result of deterioration of the Florida real estate market, the Holly Hill development

project has met with several challenges.  (Id. ¶ 3.)  In particular, during the first six months of

2008, various construction liens were filed against the project.  (Id.)  According to Nordbank, the

filing of these liens, as well as Holly Hill's failure to discharge them, constitutes a default under

the terms of Loan.  (Id.)  Given this default and others, on April 3, 2008, Nordbank decided to

---

[2] The various guaranties are collectively referred to as the "Guaranties."

accelerate the Loan, thus causing the outstanding principal and all accrued interest and fees to become due immediately. (Id.) It subsequently notified defendants not only that Holly Hill had defaulted on the Loan, and that it had chosen to accelerate repayment, but also that defendants would be required to pay all sums due under the Guaranties immediately. (Id. ¶ 4.)

When defendants failed to comply with its written demand, Nordbank commenced this action on July 3, 2008, alleging that defendants breached the Guaranties and are therefore jointly and severally liable for more than $40 million. (Id. ¶¶ 28-40.) During the course of discovery, Nordbank reviewed more than two million pages of material and produced approximately 250,000 pages. (Jt. Ltr. at 26; Kattan Decl. ¶¶ 2, 4.) In producing this information, it inadvertently produced nine documents that it claims are subject to the attorney-client privilege.[3] (Jt. Ltr. Exs. 1-9.) Once apprised of its error, Nordbank promptly sought to invoke its rights under the "claw-back" provision of the parties' protective order.[4] (Id. at 25-26; Kattan Decl. ¶

---

[3] Although only nine documents are at issue in this dispute, it appears that various iterations of those documents were produced prior to Nordbank's discovery of its error. (Jt. Ltr. at 4.)

[4] The protective order signed by the parties and entered by this Court on January 26, 2009, provides for the return of any privileged materials inadvertently produced during discovery. (Id. Ex. O ¶ 8; see also id. Ex. P ¶ 9.) In particular, it states:

> No production of Documents in this litigation shall be deemed a waiver of any legally cognizable privilege applicable to any information or Document printed therefrom. The production in this action of any Documents or other information that is subject to a claim or privilege shall be deemed to be inadvertent and to be without prejudice to any claim that such material is protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege or ground for withholding production, and no party shall be held to have waived any rights by such production. Upon the discovery of a disclosure of information for which a privilege is asserted, the producing party shall promptly notify the party in receipt of the information in writing of the

5.) Defendants, however, asserted that – for a variety of reasons – the documents were not protected by attorney-client privilege and therefore could not be recalled. The parties' formal request for resolution of this dispute ensued.

## II.    The Parties' Contentions

Nordbank argues that under the common interest doctrine, the communications at issue in this dispute are protected from disclosure by the attorney-client privilege, and may therefore be recalled. (Jt. Ltr. at 16-17.) While defendants do not dispute that the content of the communications is subject to protection by the attorney-client privilege,[5] they do contend that the common interest doctrine cannot be used to extend attorney-client privilege to the communications because Nordbank's attorneys made the communications directly to the non-party lenders rather than to their attorneys. (Id. at 6-13.) Defendants also raise several other arguments to support their claim that Nordbank cannot invoke the attorney-client privilege, including that the documents it seeks to "claw back" constitute communications in furtherance of a fraud and are therefore not protected (id. at 5-6), that the common interest agreement signed by

---

> disclosure, identify the Document that contains such information, and immediately take steps to preclude further disclosure. In such an event, the party in receipt of the information will return all copies of identified materials protected by the asserted privilege and treat those materials as if they had been initially excluded from the production.

(Id. Ex. O ¶ 8.)

[5] Review of the purportedly privileged documents reveals a valid basis for assertion of the attorney-client privilege in all cases except one. The document containing the September 23 and 24, 2008, emails between Nordbank's counsel and KBC Bank (Id. Ex 8) cannot be deemed privileged, as there is no privilege as to a client's identity. Lefcourt v. United States, 125 F.3d 79, 86 (2d Cir. 1997). Because the emails reveal little more than KBC's desire to formally retain Nordbank's counsel, and thus its status as a potential client, the emails are not protected by the attorney-client privilege.

the lenders was dated October 24, 2008, and does not relate back to the date of the communications (id. at 12-13), that Nordbank is impermissibly attempting to use the attorney-client privilege as a shield and sword (id. at 14-15), and that Nordbank's production of the purportedly privileged documents was so careless as to constitute a waiver. (Id. 15.)

## DISCUSSION

I.    **Attorney-Client Privilege and the Common-Interest Doctrine**

    A.    Overview of Attorney-Client Privilege

Under New York law,[6] the attorney-client privilege protects confidential communications between client and counsel where such communications are made for the purpose of providing or obtaining legal advice.[7] See N.Y.C.P.L.R. § 4503(a)(1); Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d 588, 593 (1989); see also Sokol v. Wyeth, Inc., No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) ("The privilege . . . shields from discovery advice given by the attorney as well as communications from the client to the attorney."). The privilege is designed "to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'" In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007), quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also In re Grand Jury Subpoena Duces Tecum Dated Sept.

---

[6] Because the basis for subject matter jurisdiction in this case is diversity of citizenship, state law provides the rule of decision. See Fed. R. Evid. 501. Accordingly, New York privilege law applies. At any rate, the New York law of attorney-client privilege is, with certain exceptions, substantially similar to the federal doctrine. See Bowne of New York City. Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993).

[7] Accordingly, "[a] document is not privileged merely because it was sent or received between an attorney and client." Dep't of Econ. Dev. v. Arthur Andersen & Co., 139 F.R.D. 295, 300 (S.D.N.Y. 1991). Instead, it "must contain confidential communication relating to legal advice." Id.

15, 1983, 731 F.2d 1032, 1036-37 (2d Cir. 1984) ("The availability of sound legal advice inures to the benefit not only of the client who wishes to know his options and responsibilities in given circumstances, but also of the public which is entitled to compliance with the ever growing and increasingly complex body of public law."). Nevertheless, because it "renders relevant information undiscoverable," In re County of Erie, 473 F.3d at 418, it "must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 377 (1991); see also Fisher v. United States, 425 U.S. 391, 403 (1976); In re County of Erie, 473 F.3d at 418.

The burden of establishing attorney-client privilege is on the party asserting it. See Spectrum Sys., 78 N.Y.2d at 377. Likewise, the party asserting the privilege also bears the burden of demonstrating that it has not been waived. See John Blair Comm'ns, Inc. v. Reliance Capital Group, L.P., 182 A.D.2d 578, 579 (1st Dep't 1992). Such a party satisfies its burden of proof where it "establish[es] that the information was a communication between client and counsel, that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." Charter One Bank, F.S.B. v. Midtown Rochester, LLC, 191 Misc. 2d 154, 166, 738 N.Y.S.2d 179 (N.Y. Sup. Ct. 2002); see also United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996).

B.      Common Interest Doctrine

Although communications between client and counsel relating to legal advice are generally privileged, the privilege is waived where such communications are "made . . . in the known presence of a third party." People v. Osorio, 75 N.Y.2d 80, 84 (1989). As New York courts have explained, "disclosure of attorney-client communication to a third party or communications with an attorney in the presence of a third party, not an agent or employee of

7

counsel, vitiates the confidentiality required for asserting the privilege." Delta Fin. Corp. v.
Morrison, 13 Misc. 3d 441, 444-45, 820 N.Y.S.2d 745 (N.Y. Sup. Ct. 2006); see also United
States v. Jacobs, 117 F.3d 82, 91 (2d Cir. 1997).

 The common interest doctrine "is an exception to the general rule that voluntary
disclosure of confidential, privileged material to a third party waives any applicable privilege."[8]
Sokol, 2008 WL 3166662, at *5; see also Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers
LLP, No. 03 Civ. 5560, 2008 WL 4452134, at *7 (S.D.N.Y. Oct. 2, 2008). The doctrine
"precludes a waiver of the underlying privilege concerning confidential communications
between the parties 'made in the course of an ongoing common enterprise and intended to
further the enterprise,' irrespective of whether an actual litigation is in progress."[9] Sokol, 2008
WL 3166662, at *5, quoting United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). It
does not, however, "encompass a joint business strategy which happens to include as one of its
elements a concern about litigation," Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,
160 F.R.D. 437, 447 (S.D.N.Y. 1995), nor does it provide "an independent source of privilege or
confidentiality." Sokol, 2008 WL 3166662, at *5, quoting In re Commercial Money Ctr., Inc.,

---

[8] Because "New York courts applying the common interest rule to civil proceedings have
often looked to federal case law for guidance," both New York and federal case law are
instructive here. Allied Irish Banks, P.L.C. v. Bank of America, N.A., 252 F.R.D. 163, 170
(S.D.N.Y. 2008).

 [9] While federal case law makes clear that the common interest doctrine applies even
where there is no litigation in progress, "New York law appears to restrict the doctrine to
communications with respect to legal advice 'in pending or reasonably anticipated litiation.'"
Allied Irish Banks, 252 F.R.D. at 171, quoting Aetna Cas. & Sur. Co. v. Certain Underwriters at
Lloyd's London, 176 Misc. 2d 605, 612, 676 N.Y.S.2d 727 (N.Y. Sup. Ct. 1998). For purposes
of this dispute, the distinction is irrelevant because the communications at issue pertain to the
timing and conduct of this litigation, and thus demonstrate that Nordbank and the non-party
lenders had, in fact, reasonably anticipated litigation at the time the communications were made.

Equipment Lease Litig., 248 F.R.D. 532, 536 (N.D. Ohio 2008).  Accordingly, where the underlying "communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." Sokol, 2008 WL 3166662, at *5.

Demonstrating the applicability of the common interest doctrine requires a two-part showing: "(1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought [must have been] designed to further that interest." Allied Irish Banks, 252 F.R.D. at 171; see also Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 465, 471 (S.D.N.Y. 2003).  Such a showing often exists in those instances in which "multiple persons are represented by the same attorney," Bank Brussels Lambert, 160 F.R.D. at 446 (quotation omitted), or "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Schwimmer, 892 F.2d at 243.

Although Nordbank contends that the common interest doctrine is applicable because this case involves a joint legal strategy that it and the non-party lenders decided upon and undertook, defendants argue that the doctrine "does not extend to communication between the first party or its attorneys and the third parties directly," but only to communications between a first party and counsel for one or more third parties. (Jt. Ltr. at 6 (emphasis omitted), citing Schwimmer and Walsh v. Northrop Grumman Corp., 165 F.R.D. 16 (E.D.N.Y. 1996).)  Thus, because the non-party lenders were not represented by counsel at the time the communications at issue were made, defendants assert that any common interest privilege that may have existed has been waived. (Id. 6-12.)  This position is meritless, and is not supported by the cases cited by defendants.

9

In <u>United States v. Schwimmer</u>, the Second Circuit noted that in order to apply the common interest doctrine, it is not "necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney."  892 F.2d at 244.  This passing reference to communications between attorneys, which simply reflects the particular facts of <u>Schwimmer</u>, does not represent a holding, or even a statement by way of dicta, that a communication from one party's attorney directly to a third party exceeds the bounds of the common interest doctrine and thus waives privilege.  The <u>Schwimmer</u> court simply did not address, and had no occasion to address, that issue.

While defendants cite <u>Walsh v. Northrop Grumman Corp.</u> as evidence that the <u>Schwimmer</u> court's pronouncement should be read as barring application of the common interest doctrine to this case, <u>Walsh</u> is inapposite.[10]  In that case, the court held that communications between parties could not be privileged simply because *one of the parties* first discussed the information with its attorney and then shared the information with the other party (not the other party's counsel).  <u>Walsh</u>, 165 F.R.D. at 18.  Here, *counsel* for one of the parties was actively engaged in the communications at issue.  Thus, this is not a situation where the various non-party lenders and Nordbank discussed subject matter previously discussed with counsel and now seek to assert privilege for that reason alone.  <u>Compare id</u>. ("To extend the common interest doctrine [in the manner advocated by the non-party asserting privilege] would mean that a party could shield from disclosure any discussions it had with another person about a matter of common interest simply by discussing that matter first with its attorneys.").  To the contrary, the asserted basis for privilege is that Nordbank's counsel was directly involved in the

_____

[10] Even if <u>Walsh</u> were relevant, the decision is not binding on this Court.

communications involving the non-party lenders and – for that reason – all parties expected that the communications would remain confidential.  This is precisely the sort of situation the common interest doctrine contemplates.

Absent any authority to the contrary, it is immaterial that the confidential communications passed from Nordbank's counsel directly to the non-party lenders, rather than passing from Nordbank or its counsel to the non-party lenders' attorneys.  Nordbank and the non-party lenders are co-lenders of the Loan and thus share a common interest in enforcing defendants' obligations under the Guaranties.  Any doubt regarding this identity of legal interests is resolved by the terms of the Loan itself.  Not only does the Loan identify Nordbank as the only party capable of "enforc[ing] or exercis[ing] any of the . . . rights or remedies of or under any of the Loan Documents," (Compl. Ex. A § 17.16), but it also contemplates that Nordbank's counsel will effectively represent the interests of the various lenders, which interests are presumed to be identical.[11]  (Id. § 17.17.)  When viewed in conjunction with the fact that the relevant communications involve development of the appropriate legal strategy for obtaining relief, and that the parties privy to the communication understood the communication to be confidential on account of attorney-client privilege, these facts bring the communications at issue squarely within the common interest doctrine.[12]

---

[11] The expectation that, under normal circumstances, the lenders' legal interests would be identical is supported by a provision in the Loan permitting a lender to retain separate counsel should it "decide that its interests have become so divergent from the interests of the other Lenders or Administrative Agent [Nordbank] that it does not feel it is prudent to be represented by the same counsel."  (Compl. Ex. A § 17.17.)

[12] Defendants' argument that the communications cannot be deemed in furtherance of the parties' common legal strategy because Nordbank and the non-party lenders did not enter into a written common interest agreement until well after the communications occurred is wholly unpersuasive.  Courts in this circuit have acknowledged that although the common interest

Defendants' suggestion that it would be improper to apply the common interest doctrine because Nordbank's common interest with the non-party lenders is a business interest, rather than a legal interest, also fails. While the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies. This is underscored by the fact that the very subject of the communications was what legal strategy would best serve the interests of Nordbank and the non-party lenders. Under these circumstances, Nordbank's showing clearly satisfies the requirements for application of the common interest doctrine. See Strougo v. BEA Assocs., 199 F.R.D. 515, 520 (S.D.N.Y. 2001) ("A community of interest exists among . . . separate corporations where they have an identical legal interest. . . . The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.").

For the foregoing reasons, the common interest doctrine covers the communications at issue and, absent any other exception to or waiver of the attorney-client privilege, Nordbank is entitled to recall any such communication inadvertently produced.

---

doctrine applies only where a party has demonstrated the existence of an agreement to pursue a common legal strategy, the agreement need not be in writing. See, e.g., Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004); Lugosch v. Congel, 219 F.R.D. 220, 237 (N.D.N.Y. 2003); cf. Doctor's Assocs., Inc. v. QIP Holder LLC, 06 Civ. 1710, 2009 WL 1683628, at *6 (D. Conn. Feb. 26, 2009). Accordingly, while Nordbank and the non-party lenders wisely chose to reduce their common agreement to writing, their decision to do so does not mean that there was no prior agreement. To the contrary, Nordbank has made a persuasive showing that the parties shared a common interest and were pursuing a joint legal strategy at the time the relevant communications were made. Indeed, given that Nordbank is the only lender that can take legal action on behalf of the group, there is no reasonable argument that there was *not* a common interest.

## II.    The Crime/Fraud Exception

Defendants next argue that because the communications at issue were made in furtherance of a fraud, the crime/fraud exception precludes application of the attorney-client privilege. (Jt. Ltr. at 5-6.) Because defendants' allegations fail to meet the requirements of the crime/fraud exception, however, this argument must be rejected.

Under the crime/fraud exception, attorney-client privilege is "to be invaded when it is abused for purposes of engaging in fraud." Danisco A/S v. Novozymes A/S, 427 F. Supp. 2d 443, 445 (S.D.N.Y. 2006). This rule "is aimed at serious misconduct," id., and can be invoked only if defendants demonstrate that there is "probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." Jacobs, 117 F.3d at 87; see also In re Fresh Del Monte Pineapple Antitrust Litig., No. 04 MD 1628, 2007 WL 64189, at *3 (S.D.N.Y. Jan. 4, 2007).

Here, defendants complain primarily of Nordbank's discussions with its counsel regarding the optimal timing for this litigation. In particular, they contend that Nordbank's counsel advised it to intentionally withhold information regarding its intent to sue so that Holly Hill would be induced to transfer the development property from the original sponsors to a third party under false pretenses. (Jt. Ltr. at 5.) Defendants, however, provide no authority for the proposition that a party is obligated to inform a potential adversary of its intent to sue, or that the failure to do so gives rise to a claim of fraud. Nordbank, on the other hand, has asserted legitimate reasons why its conduct and its counsel's conduct cannot be deemed fraudulent (see Jt. Ltr. at 22-24),[13] none of which defendants have adequately rebutted. Under these

---

[13] In particular, Nordbank argues that it cannot be held liable for fraudulent concealment absent a finding that it had a legal duty to disclose the allegedly concealed information, and there

13

circumstances, defendants' allegations fall far short of the showing of probable cause required to invoke the crime/fraud exception.  Accordingly, the exception provides no basis for vitiating Nordbank's claimed privilege.

**III.    Attorney-Client Privilege as a "Shield and Sword"**

It is well-established that "the attorney-client privilege cannot at once be used as a shield and a sword."  United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991).  In order to prevent such use, the "at issue" doctrine precludes a party from "disclos[ing] only self-serving communications," while "bar[ring] discovery of other communications that an adversary could use to challenge the truth of the claim."  In re Adelphia Commc'ns Corp., No. 02-41729, 2007 WL 601452, at *3 (Bankr. S.D.N.Y. Feb. 20, 2007); see also Bilzerian, 926 F.2d at 1292; American Re-Insurance Co. v. U.S. Fid. & Guar. Co., 40 A.D.3d 486, 492, 837 N.Y.S.2d 616 (1st Dep't 2007); cf. In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987) (noting that the "fairness doctrine" "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information").

Defendants argue that because Nordbank seeks to assert privilege over documents that are allegedly harmful to its position, while simultaneously producing related documents that are allegedly favorable to its position, its use of the attorney-client privilege violates the "sword and shield" prohibition.  (Jt. Ltr. at 14-15.)  This argument is meritless.  Defendants do not claim, much less demonstrate, that any of the "favorable" documents produced by Nordbank were

---

is no basis for such a finding in this case. (Jt. Ltr. at 23, citing Musalli Factory for Gold & Jewellry v. JP Morgan Chase Bank, N.A., No. 08 Civ. 1720, 2009 WL 860635, at *8-9 (S.D.N.Y. Mar. 31, 2009).)

written by or to its counsel, or that the documents contain legal advice and/or related client
confidences sufficient to implicate attorney-client privilege.  As discussed above, however, the
documents at issue in this dispute are privileged, as they involve confidential communications
made by Nordbank's counsel regarding the legal strategy that would best suit Nordbank and the
non-party lenders' common interests.  For the foregoing reasons, there is no basis for concluding
that Nordbank has used the attorney-client privilege as a shield and sword.[14]

IV.    **Nordbank's Alleged Carelessness**

Assuming that the inadvertently-produced communications are protected by attorney-
client privilege, defendants' final contention is that Nordbank's carelessness in producing such
documents waives the privilege and precludes it from exercising any right to recall the
documents.  (Jt. Ltr. at 15.)  This argument is also meritless.

New York law "recognize[s] that inadvertent disclosure of documents containing legal
advice may constitute a waiver of the attorney-client privilege."  Atronic Int'l, GMBH v. SAI
Semispecialists of Am., Inc., 232 F.R.D. 160, 161 (E.D.N.Y. 2005), citing 58A N.Y. Jur. 2d §
880.  Such a waiver is inappropriate, however, where (1) the party asserting the privilege
"intended to maintain confidentiality and took reasonable steps to prevent [the document's]
disclosure," (2) the "party promptly sought to remedy the situation after learning of the
disclosure," and (3) "the party in possession of the materials will not suffer undue prejudice if a
protective order is granted."  AFA Protective Sys., Inc. v. City of New York, 13 A.D.3d 564,

---

[14] To the extent defendants also argue that Nordbank should be precluded from recalling
the inadvertently produced documents because the documents go to the heart of their defense,
their position is unpersuasive.  The "at issue" doctrine relates to issues that the party asserting
privilege puts in issue, not to issues raised by that party's adversary.  Accordingly, the fact that
the documents at issue might be relevant to defendants' defense is of no moment.

565, 788 N.Y.S.2d 128 (2d Dep't 2004); New York Times Newspaper Div. of New York Times

Co. v. Lehrer McGovern Bovis, Inc., 300 A.D.2d 169, 172, 752 N.Y.S.2d 642 (1st Dep't 2002).

Although federal courts describe the standard differently, courts in this circuit have noted

that the differing description is a "distinction without a meaningful difference." Atronic, 232

F.R.D. at 161. Under the federal standard, determining whether a party's inadvertent disclosure

of otherwise privileged material constitutes a waiver requires balancing four factors: "(1) the

reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure

of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure

issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the

overarching issue of fairness." United States v. Rigas, 281 F. Supp. 2d 733, 738 (S.D.N.Y.

2003).

Whichever of these standards is applied, Nordbank's inadvertent disclosure of privileged

communications clearly does not constitute a waiver. During discovery, Nordbank engaged in

extensive review of millions of pages of documents, 250,000 of which were eventually

produced. (Jt. Ltr. at 26; Kattan Decl. ¶¶ 2, 4.) As soon as it was apprised of its inadvertent

production of nine purportedly privileged documents, it promptly sought to recall those

documents and initiated targeted searches to determine whether any other privileged documents

had been inadvertently produced. (Jt. Ltr. at 26; Kattan Decl. ¶ 5.) Moreover, when judged

against the total number of documents produced, as well as the total number of documents

reviewed, the number of privileged documents released is minuscule.

While Nordbank would thus be entitled to assert privilege under applicable case law, it is

unnecessary to rely on such case law because the parties in this dispute executed a protective

order in which they expressly agreed that the inadvertent production of a document subject to the

attorney-client privilege would be "without prejudice to any claim that such material is protected

by the attorney/client privilege" and would not effect a waiver of the producing party's rights.

(Jt. Ltr. Ex. O ¶ 8.)  Under the terms of the protective order, Nordbank has an even more

compelling case that inadvertent production of the privileged documents does not constitute a

waiver of attorney-client privilege.  Indeed, courts have held that where parties execute such an

order, waiver is appropriate only if production of the privileged material was "completely

reckless."  U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., No. 97 Civ. 6124, 2000 WL

744369, at *4 (S.D.N.Y. June 8, 2000); Prescient Partners, L.P. v. Fieldcrest Cannon, Inc., No.

96 Civ. 7590, 1997 WL 736726, at *4 (S.D.N.Y. Nov. 26, 1997).

   "For a production to be 'completely reckless,' the producing party must have shown no

regard for preserving the confidentiality of the privileged documents."  Prescient, 1997 WL

736726, at *4.  Such recklessness is manifestly absent from this case.  Nordbank's counsel has

submitted sworn testimony that in attempting to separate all privileged material from all non-

privileged and, thus, discoverable material, his firm adopted a multi-layered review process, in

which documents – particularly those presenting "close calls" – were examined by attorneys of

varying levels of seniority.  (Kattan Decl. ¶¶ 3-4.)  That privileged documents were ultimately

produced was the result not of counsel's lack of regard for preserving the documents'

confidentiality, but of a technical error by which iterations of documents identified as requiring

further "follow up" were improperly tagged.  (Id. ¶ 3.)  Accordingly, because it was not

completely reckless in its production of the privileged materials, Nordbank is entitled to avail

itself of the provisions contained in the protective order, including its right to demand that

defendants "return all copies of identified materials protected by the asserted privilege and treat

those materials as if they had been initially excluded from the production." (Jt. Ltr. Ex. O ¶ 8.)

17

## CONCLUSION

For the foregoing reasons, Nordbank's application is granted in part and denied in part. With the exception of the September 23 and 24, 2008, emails between non-party lender KBC Bank and counsel for Nordbank, the documents inadvertently produced by Nordbank are protected by the attorney-client privilege and may be recalled. Defendants are therefore ordered to return the privileged documents and are prohibited from using them in discovery or at trial. To the extent any of the documents at issue contain otherwise discoverable non-privileged information, redacted versions of the documents shall be provided.

SO ORDERED.

Dated: New York, New York
     July 22, 2009

GERARD E. LYNCH
United States District Judge

18