UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
HSH NORDBANK AG NEW YORK BRANCH, as     :
Administrative Agent for Itself and     :
Certain Lenders,                        :
                    Plaintiff,          :     08 Civ. 6131 (DLC)
                                        :
            -v-                         :     OPINION & ORDER
                                        :
MICHAEL SWERDLOW, BRIAN STREET, and     :
JAMES COHEN,                            :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For plaintiff:

Michael H. Barr
Justin N. Kattan
Claire Wong Black
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020

For defendants Brian Street and James Cohen:

Raymond N. Hannigan
Ross L. Hirsch
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

For defendant Michael Swerdlow:

John K. Shubin
Jeffrey S. Bass
Lucinda A. Hofmann
Shubin & Bass P.A.
46 S.W. 1st Street, 3rd Floor
Miami, Florida 33130

DENISE COTE, District Judge:

Plaintiff HSH Nordbank AG New York Branch ("plaintiff" or "HSH") seeks to recover from defendants monies due pursuant to two written guaranties of payment executed in connection with a real estate construction loan.  On July 21, 2009, plaintiff moved for summary judgment.  For the reasons stated herein, the motion is granted.

BACKGROUND

1.   The Loan Agreement

On December 15, 2005, HSH agreed to loan Holly Hill I Associates, Ltd. ("Borrower") up to $192 million (the "Loan") to finance the development of two 25-story residential condominium towers comprising 486 units in Holly Hill, Florida (the "Development Project").  The Borrower was a single-purpose entity, of which defendants Michael Swerdlow ("Swerdlow"), Brian Street ("Street"), and James Cohen ("Cohen") (collectively "defendants" or "Guarantors") were principals at the time of the Loan.  Defendants are experienced real estate developers who have delivered guaranties similar to those at issue in this case in other projects.  Pursuant to the Loan Agreement, Borrower executed and delivered to HSH a Promissory Note dated December 15, 2005, with a principal face amount of $192 million (the "Note").  The Loan was scheduled to mature on December 18, 2008

-- one year after the scheduled completion of construction -- to give Borrower time to close sales of sufficient units to repay the Loan.[1]

The Loan Agreement required HSH to advance Loan proceeds to Borrower pursuant to "Draw Requests" based on actual expenditures in constructing the Development Project.  Draw Requests had to be supported by invoices, budget information, or other construction-related documentation.  Draw Requests seeking release of "retainage" withheld on behalf of Borrower also had to meet certain conditions specified in the Loan Agreement.[2]

The Loan Agreement imposed several conditions on HSH's obligation to fund advances, including:  (1) no monetary or material default[3] as of the date of the advance; (2) receipt and

---

[1] The Loan was syndicated among HSH and five other lenders (the "Bank Group") in November 2006.  Pursuant to the Assignment and Acceptance Agreements signed by the other lenders, HSH retained the "full power and authority" as Administrative Agent to collect and administer the Loan, and to exercise all rights and remedies of the Bank Group under the Loan Agreement, including the exclusive right to take action in the event of a default.

[2] In construction lending, a portion of the payment due for a contractor's completed work, typically 5% to 10%, is customarily held back by the bank as "retainage" whenever the bank funds an advance.  This is done to give contractors an incentive to complete their work.  Pursuant to the Loan Agreement in this case, the retainage was to be 10%, then lowered to 5% as more of the contractors' work was completed.

[3] The Loan Agreement defines a "default" as "any event which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default."  An "Event of Default," in turn, includes Borrower's failure to make required principal, interest, or other contractually-mandated payments or

approval by HSH of a Draw Request for the advance; (3) no notice
or claim of any lien which has not been discharged or insured
against by the title insurer to the satisfaction of HSH; (4)
receipt by HSH of the written report from Lenders' Inspecting
Engineer; and (5) receipt and approval of evidence that the Loan
was "in balance."[4]  HSH had complete discretion to determine
whether these and other conditions precedent to its obligation
to fund Borrower's advances were satisfied.[5]  In the event that
HSH acquiesced to Borrower's non-compliance with any condition
precedent for a particular Draw Request, such acquiescence did
not waive any of the above requirements with respect to future
Draw Requests.  Section 7.2 of the Loan Agreement provides that
Borrower's right to request, and HSH's obligation to fund,
advances ended on the scheduled completion date of the
Development Project of December 14, 2007 (the "Funding

---

the imposition of uncured liens on the property.  The Loan
Agreement provides that after any such Event of Default, HSH has
the right to make protective advances or take other actions to
preserve the Development Project without notice to or demand
upon Borrower.

[4] The Loan is considered "in balance" when the undisbursed
portion of the Loan equals or exceeds the amount necessary to
pay for all work already performed, but unpaid; all remaining
work to be performed; and all other costs to be incurred on the
Development Project, including interest on the Loan, until the
Loan's maturity date.

[5] The Loan Agreement states:  "Administrative Agent shall, at all
times, be free to independently establish to its satisfaction
and its absolute discretion the existence or nonexistence of any
fact or facts the existence or nonexistence of which is a
condition precedent herein or in the other Loan Documents."

Deadline"). The Loan Agreement states that it may only be amended by a writing executed by all parties.

2.   The Guaranties

Contemporaneous with the Loan Agreement and Promissory Note, defendants executed on December 15, 2005 a guaranty in support of their obligations under the Loan Agreement. Defendants jointly and severally guaranteed, inter alia, "full payment when due of all interest on the Loan . . . and all expenses (including reasonable counsel fees and expenses) incurred by [HSH] in enforcing any rights under this Guaranty" (the "Payment Guaranty"). In July 2006, defendants executed an additional guaranty, which jointly and severally guaranteed, inter alia, the "payment when due, whether at stated maturity, by acceleration, lapse of time or otherwise, of the outstanding principal balance of the Loan . . . up to but not in excess of $40,000,000" and "any and all expenses (including reasonable counsel fees and expenses) incurred by [HSH] in enforcing any rights under this Guaranty" (the "Principal Guaranty") (collectively, with the Payment Guaranty, the "Guaranties"). The Guaranties provide that they are to be governed by, and construed in accordance with, New York law. [6]

---

[6] The Loan Agreement, Promissory Note, and Guaranties are collectively referred to herein as the "Loan Documents."

HSH required the Principal Guaranty as additional security prior to consenting to modifications to the Loan Agreement sought by defendants in 2006.  Specifically, Street and Cohen wished to buy out Swerdlow's interest in Borrower and the Development Project and also wished to secure a mezzanine financing facility (the "Mezzanine Loan") for the Development Project (and other projects) from Cerberus Capital Management ("Cerberus").[7]  The ownership change was effectuated, in part, through a Third Amendment to the Loan Agreement.  The Principal Guaranty states that HSH's approval of the ownership change and the Mezzanine Loan was conditioned on defendants, including Swerdlow notwithstanding the ownership change, executing and delivering the Principal Guaranty.  When the Mezzanine Loan closed in July 2006, HSH and Cerberus entered into an Intercreditor Agreement dated July 6, 2006, which required, inter alia, HSH's consent to any transfer of Street and Cohen's interest in Borrower and the Development Project to Cerberus in the event of a default on the Mezzanine Loan.

The Guaranties contain provisions designed to maintain Guarantors' liability irrespective of any change in circumstances with respect to the underlying Loan.  Each Guaranty states that it is "an irrevocable, absolute, continuing

---

[7] The Mezzanine Loan was extended by a Cerberus-owned entity, Madeleine LLC.

guaranty of payment and performance and not a guaranty of

collection."[8]  The Payment Guarantee states that the liability of

Guarantors is "absolute and unconditional" irrespective of,

<u>inter</u> <u>alia</u>, "any change in the time, manner or place of payment

of, or in any other term of, all or any of the Obligations, or

any other amendment or waiver of or any consent to departure

from the Note" or "any other circumstance which might otherwise

constitute a defense available to, or a discharge of, Borrower

or a guarantor."  The Guaranties further provide that HSH,

without notice to or further consent of any Guarantor, may at

any time

> extend the time of payment of, exchange or surrender
> any collateral for, or renew any of the Obligations,
> and may also make any agreement with Borrower or with
> any other party to or person liable on any of the
> Obligations, or interested therein, for the extension,
> renewal, payment, compromise, discharge, or release
> thereof, in whole or in part, or for any modification
> of the terms thereof or of any agreement between
> Administrative Agent and Borrower or any of such other
> party or person, without in any way impairing or
> affecting this Guaranty.

Defendants also waived any and all forms of "notice with

respect to any portion of the Obligations and this

Guaranty" and any requirement that HSH "exhaust any right

or take any action against Borrower or any other person or

entity or any collateral."  Each guaranty states that it is

---

[8] Citations to the Guaranties herein are to the Payment Guaranty
unless otherwise indicated.  Nearly identical language appears
in the Principal Guaranty.

"a continuing guaranty and shall remain in full force and effect until payment in full of the Obligations."

3.   Events of Default

The Development Project began to experience difficulties in 2007, including a slowdown in unit sales, the filing of a lawsuit by unit purchasers alleging that Borrower made material misrepresentations in its promotional materials, and a growing number of "problem units."[9]  In late November 2007, Borrower informed HSH that construction of the Development Project would not be completed by the December 14, 2007 Funding Deadline.  On December 14, HSH sent a letter to the Bank Group requesting the other lenders' approval to fund advances past the Funding Deadline and warning that cutting off funding might prevent Borrower from being able to pay off the Loan.  Each lender concurred and executed the December 14 letter.

By a letter dated January 3, 2008, HSH advised Borrower that although the Bank Group's obligation to fund advances had ended pursuant to Section 7.2 of the Loan Agreement, it would consider authorizing additional advances through approximately February 12, 2008, depending on the circumstances at the time of the Draw Request.  The letter cautioned, however, that the

---

[9] Beginning in October 2007, HSH requested regular updates concerning sales, closings, and "problem units" -- those units where the purchaser had either sued or threatened to sue to void their purchase agreement, or were unable to close for other reasons.

lenders were "under no obligation to make any such further Advances" and that any Draw Request would "be assessed by [HSH] on a case-by-case basis" and "granted or denied in [HSH's] sole and absolute discretion." Further, the letter stated that "any decision by [HSH] to authorize further Advances shall not constitute a course of conduct or course of dealing on the part of [HSH] or the Lenders, and [HSH] may cease authorizing further Advances at any time and for any reason, in its sole and absolute discretion."

HSH funded two additional Draw Requests: one on January 8, 2008 ("Draw Request 24") and another on February 12 ("Draw Request 25"). Borrower had submitted an additional Draw Request for $8 million (of which approximately $5 million was retainage) on or about January 28 ("Draw Request 26"). HSH notified Borrower on February 19 that it would reserve its decision on whether to fund Draw Request 26 until after a meeting scheduled for February 26 between the Borrower and the Bank Group.

Meanwhile, problems continued to arise at the Development Project. On or about January 23, 2008, Cerberus declared the Mezzanine Loan in default. By early February, Borrower reported 120 "problem units" (approximately one-third of all units pre-sold), and only 66 closings. Between January and March 2008, multiple liens were filed against the Development Project. The Bank Group became concerned that the Loan was "out of balance"

and that the "reserve account," which had been established to pay Borrower's interest payments, did not have sufficient funds to cover Borrower's January 2008 interest payment.  The Bank Group was also concerned that the use of net proceeds from unit sales to cover Borrower's interest payments, instead of paying down principal, would diminish the prospects that the Loan would be repaid in full.

After the February 26 Bank Group meeting, HSH told Borrower that it would be willing to consider funding Draw Request 26 if Borrower rebalanced the Loan to cover certain costs, marketing, and interest payments through maturity.  Borrower urged HSH to fund Draw Request 26 to allow it to clear the liens and complete construction.  HSH decided, however, not to fund Draw Request 26 and communicated its decision to Borrower on or about February 29.  On March 3, HSH sent a "Cease Funding" letter to all of the contractors working on the Development Project, advising them that HSH had decided to stop funding the Loan.  Subcontractors abandoned the Development Project in the days following the Cease Funding notice, and many filed liens on the property shortly thereafter.  More than 50 new liens were filed on the property between March 3 and the end of April 2008.

By letters dated March 10, March 14, and March 19, 2008, HSH notified Borrower of an Event of Default based on Borrower's failure to discharge certain liens within the 15 days required

by the Loan Agreement.  Borrower tried to persuade HSH to fund
Draw Request 26 to clear the liens.  HSH declined Borrower's
entreaties.  On April 1, Borrower failed to make a scheduled
interest payment, which constituted another Event of Default.
On April 3, HSH accelerated the balance due on the Loan and
declared all sums outstanding to be immediately due and payable
in full.  The outstanding principal balance of the Loan as of
April 3, 2008 was $132,684,433.69 and accrued interest was
$660,883.99.

HSH notified Guarantors by letter dated April 4, 2008 that
Borrower had defaulted and that the Loan had been accelerated.
HSH demanded that Guarantors make immediate payment of the $40
million owed under the Principal Guaranty, as well as all
accrued interest and fees due pursuant to the Payment Guaranty.
Guarantors did not respond.  On May 16, 2008, HSH notified
Guarantors that they were in breach of their obligations under
the Guaranties.

4.   Supplemental Intercreditor Agreement between HSH and
Cerberus

After Cerberus declared the Mezzanine Loan in default on or
about January 23, 2008, defendants Street and Cohen engaged in
negotiations with Cerberus concerning, inter alia, the transfer
of their interests in Borrower and the Development Project to
Cerberus.  Pursuant to the July 6, 2006 Intercreditor Agreement

between Cerberus and HSH, HSH's consent was required before ownership of Borrower could be transferred to Cerberus.  HSH was not a party to the negotiations between Borrower and Cerberus, but received periodic updates from Robert Smither, Borrower's Chief Financial Officer.

On March 20, HSH attended an initial meeting with representatives of Cerberus to discuss the status of the Development Project and the possible transfer of Street and Cohen's interests in Borrower to Cerberus.  HSH and Cerberus subsequently engaged in negotiations over how to proceed with respect to the Development Project.  On May 30, HSH consented to Cerberus' acquisition of Borrower.  Street and Cohen transferred their equity interests in Borrower to Cerberus on June 3. Swerdlow did not take part in this transfer of ownership.

The Bank Group and Cerberus subsequently executed a Supplemental Intercreditor Agreement (the "SICA") on July 18. The SICA provides, inter alia, that: the Loan remains in default and accelerated; notwithstanding the default, HSH will forbear from foreclosing on the Development Project for five years, with a one-year extension option, provided Cerberus fulfills its obligations under the SICA and no new Event of Default occurs; and Cerberus' first principal payment is suspended until January 18, 2010.  The SICA expressly reserves to HSH and the other lenders all "rights and remedies under the Guaranties or

otherwise available to [HSH and the other lenders] against the
Guarantors, all of which remain in full force and effect and
available for exercise by [HSH and the other lenders] at any
time in their sole and absolute discretion."

5.   HSH's Suit to Enforce the Guaranties

On July 3, 2008, HSH filed a complaint against defendants
seeking to enforce the Guaranties.  To date, Guarantors have
made no payments required by the Guaranties.  HSH moved for
summary judgment on July 21, 2009.  HSH seeks to recover $40
million of the outstanding principal balance pursuant to the
Principal Guaranty.  HSH seeks an unspecified amount of damages
for accrued interest, late fees, and other administrative
charges related to missed payments pursuant to the Payment
Guaranty.  In addition, HSH seeks to recover $928,770.83 for
"protective advances" that it made on Borrower's behalf and
$216,218.37 that it paid for fees owed by Borrower pursuant to
an Interest Rate Hedge Agreement.  Finally, HSH seeks pre- and
post-judgment interest and attorneys' fees.

DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see SCR

13

Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Roe v. City of Waterbury, 542 F.3d 31, 35-36 (2d Cir. 2008).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); accord Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord SCR Joint Venture, 559 F.3d at 137.

1.  HSH's Prima Facie Case

Pursuant to the choice-of-law provision in the Guaranties, New York law applies.  See Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003).  Under New

York law, a guaranty is "the promise to answer for the payment of some debt or the performance of some obligation, on default of such payment or performance, by a third person who is liable in the first instance." Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000) (citation omitted); see also Weissman v. Sinorm Deli, Inc., 669 N.E.2d 242, 246 (N.Y. 1996). Guaranty agreements are to be construed under ordinary principles of contract construction. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc. ("CFC v. Merrill Lynch"), 188 F.3d 31, 34 (2d Cir. 1999). If the intent of the parties is clear from the four corners of a guaranty, its interpretation is a matter of law that the court may determine by summary judgment. American Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006). Under New York law, guaranty agreements are construed strictissimi juris. CFC v. Merrill Lynch, 188 F.3d at 34. While "the liability of a surety cannot be extended beyond the plain and explicit language of the contract, a surety is not entitled to any particular tenderness in the interpretation of the language of his contract." Id. (citation omitted). "Where, as here, a creditor seeks summary judgment upon a written guaranty, the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee." Kensington House Co.

15

v. Oram, 739 N.Y.S.2d 572, 572 (1st Dep't 2002); see also City of New York v. Clarose Cinema Corp., 681 N.Y.S.2d 251, 253 (1st Dep't 1998).

Defendants do not dispute that the Guaranties are "absolute and unconditional," that Events of Default occurred in March and April 2008, that HSH accelerated the Loan in April 2008, or that no payments have been made under either of the Guaranties. Defendants argue, however, that HSH fails to establish a prima facie case because the SICA -- which they did not execute -- superseded the Loan Agreement and suspended the default on the Loan.  The defendants have not pointed to any language in the Guaranties to support this argument.  Moreover, the argument is belied by the clear contractual language of the SICA.  The SICA states that the Loan Documents remain "in full force and effect and binding on the Guarantors" and makes clear that the Loan remains "in default and accelerated."  The SICA expressly reserves HSH's rights and remedies against the Guarantors, "all of which remain in full force and effect for exercise by [HSH and the lenders] at any time in their sole and absolute discretion."  Defendants provide no legal authority to support their position that this Court should look beyond the unambiguous terms of the Loan Documents or the SICA to find that the Loan Agreement was superseded by the SICA or that the

default has been suspended.[10]  Because HSH has established its
prima facie case, the burden shifts to defendants to assert a
meritorious defense for which a genuine issue of material fact
exists in order to survive summary judgment.  See Bank Leumi
Trust Co. of N.Y. v. Ratter & Liebman, 582 N.Y.S.2d 707, 708
(1st Dep't 1992); Gateway State Bank v. Shangri-La Private Club
for Women, Inc., 493 N.Y.S.2d 226, 227 (2d Dep't 1985).

2.   Affirmative Defenses

     Defendants advance five affirmative defenses to HSH's
claims:  (1) HSH frustrated Borrower's performance on the Loan
by refusing to fund Draw Request 26, thereby causing the
default; (2) HSH breached the implied covenant of good faith and
fair dealing by refusing to fund Draw Request 26 contrary to
Borrower's expectations; (3) HSH breached a contractual
obligation under the Loan Agreement to release the retainage
requested as part of Draw Request 26; (4) HSH modified the Loan
Agreement to fund advances through February 12, 2008, including

---

[10] Defendants rely on GE Capital Mortg. Services, Inc. v.
Pinnacle Mortg. Inv. Corp., 897 F.Supp. 842 (E.D.Pa. 1995), to
support their argument that they are not liable because the
default was suspended.  Defendants' reliance on GE Capital is
misplaced.  In GE Capital, New Jersey law governed the loan
agreement and therefore a non-written modification was
permitted.  Id. at 850.  Defendants do not dispute that the Loan
Agreement in this case requires any modification of the Loan
Agreement to be in writing, that the Loan Agreement is governed
by New York law, and that New York law honors a contractual
requirement that an amendment be in writing.  See id. at 850
n.5.

Draw Request 26; and (5) defendants' obligations were discharged by the transfer of ownership of Borrower to Cerberus and the restructuring of the Loan pursuant to the SICA.  Additionally, Swerdlow argues that he is released from the Guaranties because he did not consent to the Cerberus takeover of Borrower, the restructuring of the Loan radically changed the underlying obligation, and HSH waived its reliance on the advance consent provision through its course of conduct with him.[11]  HSH maintains that defendants' arguments are all barred because the Guaranties are "absolute and unconditional" and in any event, defendants waived all affirmative defenses.

Where a guaranty states that it is "absolute and unconditional," guarantors are generally precluded from raising any affirmative defense.  See CFC v. Merrill Lynch, 188 F.3d at 35; accord Citibank, N.A. v. Plapinger, 485 N.E.2d 974, 977 (N.Y. 1985).  Under New York law, it is well-settled that unconditional guarantees are enforceable if written in "clear and unambiguous" terms.  Otto Roth & Co. v. Gourmet Pasta, Inc., 715 N.Y.S.2d 78, 80 (2d Dep't 2000); Korea First Bank of N.Y. v. Cha, 687 N.Y.S.2d 124, 125 (1st Dep't 1999).  Furthermore, a guarantor cannot assert defenses that it expressly waived in the guaranty agreement.  See CFC v. Merrill Lynch, 188 F.3d at 34-

---

[11] Swerdlow appears to argue that only the Payment Guaranty is at issue.  It is clear, however, that HSH seeks to recover against him under both the Payment Guaranty and Principal Guaranty.

35; see also Sterling Nat. Bank v. Biaggi, 849 N.Y.S.2d 521, 522

(1st Dep't 2008); United Orient Bank v. Lee, 637 N.Y.S.2d 96, 96

(1st Dep't 1996); Gannett Co. v. Tesler, 577 N.Y.S.2d 248, 249

(1st Dep't 1991).[12]  Likewise, advance consent provisions in a

guaranty may render a guarantor liable even after a release of

the principal borrower or modification of the underlying loan.

See CFC v. Merrill Lynch, 188 F.3d at 34-35; Korea First Bank,

687 N.Y.S.2d at 126; United Orient Bank, 637 N.Y.S.2d at 96.

    The language in the Guaranties at issue here is sufficient

to bar the affirmative defenses raised by defendants.[13]  The

Guaranties state that they are "absolute and unconditional"

irrespective of, inter alia, "any other circumstance which might

otherwise constitute a defense available to, or a discharge of,

Borrower or a guarantor."  Further, both Guaranties state that

---

[12] A defendant cannot rely on defenses that were waived by a
guaranty to defeat summary judgment, even if the defendant
establishes an issue of fact concerning the defense.  See
Generale Bank v. Wassel, 779 F.Supp. 310, 318 (S.D.N.Y. 1991)
("[T]he Appellate Division often reverses the [New York] Supreme
Court and grants summary judgment on an unconditional guarantee
and waiver of defenses, even though the lower court has
discerned disputed issues of fact.").

[13] Defendants argue that their frustration of performance and bad
faith arguments are not affirmative defenses, but instead
undermine plaintiff's prima facie case because they show that
the default was a "sham."  These arguments are in fact
affirmative defenses and as such, they too are barred by the
Guaranties.  See Hotel 71 Mezz Lender LLC v. Mitchell, 880
N.Y.S.2d 67, 68 (1st Dep't 2009); Red Tulip, LLC v. Neiva, 842
N.Y.S.2d 1, 6-8 (1st Dep't 2007).

the Guarantors shall remain liable notwithstanding "any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from the Note."  The Guaranties permit HSH to make such modifications "without notice to or further consent of any Guarantor."  New York courts have consistently upheld broadly worded waiver language like that which appears in the Guaranties to preclude the affirmative defenses raised by defendants.  See CFC v. Merrill Lynch, 188 F.3d at 35 (citing cases).[14]

Even if the Guaranties did not bar defendants' affirmative defenses, they would still fail as a matter of law.  Defendants provide no evidence to raise a question of fact that HSH intentionally frustrated Borrower's performance under the Loan, breached any provision under the Loan Documents, or acted in bad faith by refusing to fund Draw Request 26.  Rather, HSH merely exercised its express contractual right to discontinue funding advances after the December 14, 2007 Funding Deadline. "[E]xercising contract rights to protect an investment does not

---

[14] Defendants argue that the SICA's modifications to the Loan exceed the scope of the waiver and advance consent provisions. This argument is without merit.  The waiver and advance consent provisions in the Guaranties are broad enough to waive Guarantors' defenses irrespective of the scope the modifications pursuant to the SICA.  See White Rose Food v. Saleh, 788 N.E.2d 602, 603 (N.Y. 2003); First Am. Bank of New York v. Builders Funding Corp., 607 N.Y.S.2d 460, 462 (3d Dep't 1994).

constitute bad faith." Roswell Capital Partners LLC v.
Alternative Const. Technologies, 638 F.Supp.2d 360, 371
(S.D.N.Y. 2009) (Cote, J.) (citing Red Tulip, 842 N.Y.S.2d at
7).

Defendants' argument that HSH waived its right under the
Loan Agreement -- either explicitly or implicitly -- to refuse
to fund additional advances after the Funding Deadline is
without merit. It is undisputed that the Loan Agreement was
never amended in writing as would be required to alter the
Funding Deadline or to alter HSH's right to refuse to fund
advances.[15] Furthermore, the Loan Agreement waived Borrower's
right to rely on any custom or practice of HSH, any course of
dealing with HSH, any purported oral representation or agreement

---

[15] Defendants point to a November 2, 2007 letter drafted by
Robert Smither, Borrower's CFO, and sent to Robert Mathes, an
HSH loan officer, which was to be placed on HSH letterhead and
provided to a lender to a unit purchaser. Smither's draft
letter states, inter alia, that "[HSH] is not aware of any cost
overruns or loan violations that would cause the bank to limit
or curtail the advances schedule in the loan agreement and
necessary to complete the development." Mathes revised the
letter before sending it back to Smither, adding "At this time"
to the foregoing language. Mathes also added the following
phrase at the end of the letter: "Notwithstanding the foregoing,
this notice does not constitute a waiver of any rights and/or
remedies the undersigned may have under the Loan Agreement, the
Note, the Mortgage, and/or any other Loan Documents, at law,
and/or in equity." Even if this letter could be considered a
written amendment to the Loan Agreement (which is doubtful since
it was signed only by HSH, not Borrower), the edits made by
Mathes make it clear that HSH did not waive any of its rights
pursuant to the Loan Agreement, including its right to refuse to
fund advances after the Funding Deadline.

made by HSH, or any acquiescence by HSH in any noncompliance
with the conditions precedent for funding advances.  As such,
even if Borrower believed that HSH had demonstrated a
willingness to continue to fund advances through the completion
of construction, any reliance by Borrower on HSH's conduct was
precluded by the Loan Agreement.[16]  In sum, HSH has met its
burden of demonstrating that there is no material fact in
dispute as to defendants' liability under both Guaranties and
therefore summary judgment is appropriate.

3.  Damages

        HSH has demanded payment from defendants pursuant to
both Guaranties.  HSH identifies its damages pursuant to
the Principal Guaranty as $40 million, plus interest and
attorneys' fees.  The outstanding principal balance of the
Loan as of April 3, 2008 -- the date the Loan was
accelerated -- was $132,684,433.69.  It is thus undisputed
that there is more than $40 million of outstanding
principal due on the Loan and that defendants have made no

---

[16] Defendants' reliance on Canterbury Realty & Equip. Corp. v.
Poughkeepsie Sav. Bank, 524 N.Y.S.2d 531, 533 (3d Dep't 1988),
and Bank of China v. Chan, 937 F.2d 780, 783 (2d Cir. 2002), is
misplaced.  Unlike in Canterbury and Bank of China, there is no
evidence here that HSH and the Borrower reached any agreement
that went beyond the terms of the Loan Documents.  To the
contrary, the January 3, 2008 letter from HSH to Borrower
explicitly states that HSH's willingness to consider funding
additional advances after the Funding Deadline was wholly
discretionary and did not affect HSH's right to refuse to fund
additional advances for any reason.

payments under the Principal Guaranty.  HSH has met its
burden and summary judgment is appropriate as to the full
amount of defendants' $40 million liability under the
Principal Guaranty.

HSH identifies its damages pursuant to the Payment
Guaranty as comprising accrued interest on the Loan, late
fees, as well as protective advances and fees paid on
Borrower's behalf pursuant to an interest rate hedge, plus
interest and attorneys' fees.  As of July 17, 2009, more
than $9,842,832.47 in unpaid accrued interest was due and
owing.  HSH also paid $928,770.83 in protective advances
and $216,218.37 in fees on the interest rate hedge.
Defendants provide no evidence to contest these amounts.
HSH does not, however, specify the total amount of damages
it seeks pursuant to the Payment Guaranty.  Therefore,
while summary judgment is appropriate with respect to these
damages, additional briefing is required to determine the
precise amount of defendants' liability under the Payment
Guaranty.

CONCLUSION

For the foregoing reasons, plaintiff's July 21 motion for
summary judgment is granted as to defendants' liability under
the Principal Guaranty for $40 million, and under the Payment

23

Guaranty for an amount to be determined through additional
briefing. An appropriate amount of attorneys' fees and interest
shall also be determined in subsequent briefing.

SO ORDERED:

Dated:     New York, New York
           November 23, 2009

                                        DENISE COTE
                                United States District Judge

24