UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
HSH NORDBANK AG NEW YORK BRANCH, as     :
Administrative Agent for Itself and     :
Certain Lenders,                        :
                         Plaintiff,     :      08 Civ. 6131 (DLC)
                                        :
              -v-                       :      OPINION & ORDER
                                        :      _____
MICHAEL SWERDLOW, BRIAN STREET, and     :
JAMES COHEN,                            :
                                        :
                         Defendants.    :
                                        :
----------------------------------------X

Appearances:

For plaintiff:

Michael H. Barr
Justin N. Kattan
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020

For defendants Brian Street and James Cohen:

Raymond N. Hannigan
Ross L. Hirsch
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

For defendant Michael Swerdlow:

John K. Shubin
Jeffrey S. Bass
Shubin & Bass P.A.
46 S.W. 1st Street, 3rd Floor
Miami, Florida 33130

DENISE COTE, District Judge:

Plaintiff HSH Nordbank AG New York Branch ("HSH") has brought this action to enforce the obligations of defendants Brian Street ("Street"), James Cohen ("Cohen"), and Michael Swerdlow ("Swerdlow") (collectively, the "defendants") under a Payment Guaranty and a Principal Guaranty (the "Guaranties") executed in connection with a $192 million loan.  On November 23, 2009, summary judgment was granted to HSH as to the defendants' liability under both Guaranties.  HSH Nordbank Ag New York Branch v. Swerdlow, No. 08 Civ. 6131 (DLC), -- F.Supp.2d --, 2009 WL 4042838 (S.D.N.Y. Nov. 23, 2009) (the "November 23 Opinion").[1]  HSH was directed to submit an affidavit setting forth the amounts owed by defendants under the Guaranties, as well as attorneys' fees, costs, and interest.  Defendants were permitted to file an opposition along with appropriate evidentiary support.  For the following reasons, HSH shall be awarded the damages, attorneys' fees, costs, and interest that it seeks.

---

[1] Defendants filed motions for reconsideration of the November 23 Opinion, which were denied in a separate Opinion dated March 24, 2010.

BACKGROUND

The relevant factual background is provided in the November 23 Opinion.  In December 2005, HSH and other lenders (the "Bank Group") extended a $192 million loan (the "Loan") to Holly Hill I Associates, Ltd. (the "Borrower"), a real-estate investment entity that was then controlled by the defendants, pursuant to a Loan Agreement.  The Loan was used to fund a condominium development in Florida (the "Development Project").  Under the Loan Agreement, interest payments on the outstanding principal balance on the Loan are due on a monthly basis.  Unpaid interest accrues at the applicable interest rate or, upon the occurrence of an Event of Default, at the "Default Rate."[2]  If the Loan is

_____

[2] Section 2.2(c) of the Loan Agreement provides in pertinent part:

> Upon the occurrence of an Event of Default, each LIBOR Based Loan and Eurodollar Based Loan shall bear interest for the remainder of the applicable Interest Period at the rate otherwise applicable to such Interest Period plus 5% per annum and thereafter at a rate equal to the LIBOR Rate for an Interest Period of one month plus five percent and any portion of the Loan bearing interest at the Prime Rate or the Cost of Funds Rate shall thereafter bear interest at a rate equal to the Prime Rate plus 5% (collectively, the "Default Rate"), except that with respect to an Event of Default of the type described in Section 14.1(x), interest at the Default Rate shall commence to accrue as of the date five days after the date on which such Event of Default occurs.  If Borrower fails to pay all or any part of the Loan when due on maturity or its earlier acceleration, the Loan, to the extent unpaid, thereafter shall bear interest at the Default Rate

accelerated, the Loan Agreement provides that interest shall continue to accrue at the Default Rate.

Contemporaneous with the Loan Agreement, the defendants executed a Payment Guaranty. Pursuant to § 1 of the Payment Guaranty, the defendants "unconditionally, jointly and severally" guaranteed, inter alia, "full payment when due of all Operating Expenses"[3] and "full payment when due of all interest on the Loan." In July 2006, the defendants executed the Principal Guaranty. Pursuant to § 1 of the Principal Guaranty, the defendants "jointly and severally, irrevocably and unconditionally" guaranteed the payment when due of the outstanding principal on the Loan up to $40 million. Both Guaranties also obligate the defendants to pay "any and all expenses (including reasonable counsel fees and expenses) incurred by Administrative Agent [HSH] in enforcing any rights under [the Guaranties]."

---

(both before and after acceleration and maturity), both before and after entry of judgment.

[3] "Operating Expenses" are defined in the Loan Agreement to include "expenses incurred by Administrative Agent [HSH] and/or Lenders and required to be reimbursed by Borrower under this Agreement and/or the other Loan Documents." Under § 15.3 of the Loan Agreement, such Operating Expenses include so-called "protective advances." Section 15.3 provides that if the Borrower failed "to make any payment or perform any act required by the Loan Documents," then after the occurrence of an Event of Default, HSH had the right to make protective advances or take other actions to preserve the Development Project.

After the occurrence of several Events of Default, HSH accelerated the Loan on April 3, 2008.  At the time of acceleration, the outstanding principal balance on the Loan was $132,340,527.56.  HSH notified the defendants by letter dated April 4, 2008, that the Borrower had defaulted and that the Loan had been accelerated.  HSH demanded that the defendants make immediate payment of all accrued interest and $40 million of the outstanding principal balance on the Loan pursuant to the Guaranties.  Defendants did not respond.  By letter dated May 16, 2008, HSH notified the defendants that they were in breach of their obligations under the Guaranties.  To date, the defendants have made no payments under the Guaranties.

On July 3, 2008, HSH filed this action to enforce the Guaranties.  The matter was initially assigned to the Honorable Gerard E. Lynch.  The defendants filed their answers on August 29, raising a number of affirmative defenses, even though the Guaranties provided that such defenses were waived.  See HSH Nordbank, 2009 WL 4042838, at *7.  In October 2008, the defendants served broad document demands that sought production of all material concerning the Loan and the Guaranties dating back to January 2005 -- nearly a year before the Loan was even issued.  Although HSH initially complied with the defendants' document demands, in November 2008, HSH amended its initial response and objected to the production of any material that

5

pre-dated January 1, 2007.  Defendants refused to impose such a
time limit on HSH's document production obligations and insisted
that HSH produce all documents concerning the negotiation of the
Guaranties and all communications with Cerberus Capital
Management ("Cerberus") dating back to 2005.

In January 2009, a discovery dispute arose between the
parties regarding HSH's obligation to produce documents on
behalf of non-party lenders in the Bank Group.  On February 2,
the defendants moved for an order compelling HSH to produce
documents on behalf of all members of the Bank Group.  HSH
suggested that the non-party lenders' obligations be limited to
relevant documents created between the time that HSH requested
their consent to fund the Loan beyond the Funding Deadline, and
the date the Supplemental Intercreditor Agreement ("SICA") with
Cerberus was signed.  The defendants objected to this proposed
limitation, and the defendants' motion was granted on February
19.  Even after HSH was ordered to produce documents on behalf
of the non-party lenders, HSH urged the defendants to narrow the
time frame of their document requests.  Defendants refused.
HSH's counsel thereafter collected and reviewed more than one
million pages of documents from the Bank Group in March and
April 2009, of which 100,000 pages were produced.  This effort

was in addition to counsel's earlier collection and review of
one million pages of documents from HSH.[4]

The defendants noticed depositions or subpoenaed
approximately two dozen witnesses.  HSH requested that the
defendants pare down their list of potential deponents.  In the
end, the defendants deposed eighteen witnesses, including more
than a dozen non-party witnesses.  HSH deposed five witnesses.
In late June 2009, defendants Street and Cohen, with the consent
of Swerdlow, sought an adjournment of the schedule and an
extension of the page limits for the briefing on the motion for
summary judgment.  Defendants requested a one-week extension in
part to "allow more time to review and cull the substantial
universe of evidence."  Defendants also requested to file two
forty-page memoranda (one on behalf of Street and Cohen, and
another on behalf of Swerdlow) "in recognition of the breadth of
the relevant evidence and the complexity of the issues
presented."  Defendants noted in their application that "several
hundred thousand pages of documents have been exchanged and more

---

[4] In early June 2009, the parties sought judicial resolution of a
second discovery dispute concerning a request by HSH that the
defendants return certain privileged documents that were
inadvertently produced.  See HSH Nordbank AG New York Branch v.
Swerdlow, 259 F.R.D. 64, 68 (S.D.N.Y. 2009) (Lynch, J.).  After
finding the defendants' various objections to the return of the
privileged documents without merit, id. at 71-75, HSH's
application was granted with the exception of two emails found
to be not privileged.  Id. at 75.

than twenty depositions have been taken (involving a few hundred exhibits)" and that "the various defenses alleged in the Answer are firmly supported by a wealth of documentary evidence and testimony."  HSH consented to the defendants' request, which was granted on June 25.

HSH moved for summary judgment on July 21, 2009, and the motion became fully submitted on August 21.  On October 1, the action was reassigned to this Court.  The November 23 Opinion granted summary judgment to HSH with respect to the defendants' liability under both Guaranties.  The defendants were held liable for $40 million pursuant to the Principal Guaranty.  HSH was ordered to submit an affidavit and supporting evidence of the amounts owed by defendants under the Payment Guaranty, as well as attorneys' fees, expenses, and interest.

On December 4, HSH submitted the affidavit of Michael Carter, a Senior Vice President at HSH (the "Carter Affidavit"). The Carter Affidavit states that through November 30, 2009, $21,623,492.06 in unpaid accrued interest on the outstanding principal balance on the Loan is due and owing.  In addition, HSH made five protective advances totaling $928,770.86 to cover necessary operating expenses of the Development Project, for which HSH contends the defendants are liable under the Payment Guaranty.  HSH notified the defendants by letter each time such a protective advance was made.  The Carter Affidavit indicates

that as of November 30, 2009, $142,556.77 in unpaid interest is due and owing on the protective advances.

HSH contends that the defendants are liable for prejudgment interest on the $40 million owed under the Principal Guaranty starting from April 5, 2008 -- the day after HSH demanded payment under the Guaranties and the earliest possible date that HSH's cause of action for breach of the Principal Guaranty could have been ascertained.  Applying the 9% per annum interest rate proscribed by New York law, see N.Y. C.P.L.R. § 5004, the Carter Affidavit calculates that through December 4, 2009, the defendants are liable for $6,006,573.09 in prejudgment interest on the $40 million owed under the Principal Guaranty. Prejudgment interest continues to accrue at a rate of $9,863.01 per day from December 5, 2009, through entry of judgment.[5]

HSH contends that the defendants are also liable for prejudgment interest on the amounts owed under the Payment Guaranty.  Applying the 9% per annum interest rate proscribed by New York law, the Carter Affidavit calculates that through December 4, 2009, the defendants are liable for $1,929,242.43 in

---

[5] The amount of prejudgment interest on the $40 million owed under the Payment Guaranty is calculated as follows:  9% of $40,000,000 is $3,600,000.  Dividing $3,600,000 by 365 results in a daily interest rate of $9,863.01.  There are 609 days between April 5, 2008 and December 4, 2009.  609 days of interest at $9,863.01 per day results in a total of $6,006,573.09 in prejudgment interest as of December 4, 2009.

prejudgment interest on the $21,623,492.06 in unpaid accrued interest on the outstanding principal balance on the Loan, and for $132,523.80 in prejudgment interest on the $928,770.86 in protective advances owed under the Payment Guaranty. Prejudgment interest continues to accrue at a rate of $5,339.22 per day with respect to the unpaid interest on the outstanding principal balance, and at a rate of $229.01 per day with respect to the protective advances from December 5, 2009, through entry of judgment.

Finally, HSH seeks attorneys' fees and expenses incurred in enforcing the Guaranties.  The Carter Affidavit states that through November 30, 2009, HSH incurred a total of $3,131,707.73 in attorneys' fees and litigation expenses.  Invoices submitted with the Carter Affidavit indicate that through November 2009, fees from HSH's counsel, Sonnenschein Nath & Rosenthal LLP ("Sonnenschein"), totaled $2,655,190.87, and through October 2009, fees from HSH's local counsel in Florida totaled $20,657.96.[6]  HSH also submitted invoices that indicate that it incurred $455,857.90 in litigation-related expenses, comprised of $45,874.50 for court reporting and deposition transcript

---

[6] Pursuant to § 17.17 of the Loan Agreement, Sonnenschein was retained as counsel for HSH in all matters in connection with the Loan, including the enforcement of the Guaranties.  HSH also retained Shutts & Bowen as local counsel in Florida to advise on issues regarding Florida law in connection with the enforcement of the Guaranties.

services; $408,071.34 for services relating to electronic data storage and hosting for e-discovery; and $1,912.06 for photocopying services.  HSH claims that a significant portion of its fees and expenses are attributable to the broad discovery demands of the defendants.

On December 15, the defendants filed their opposition to HSH's submission and requested an evidentiary hearing.  The defendants do not take issue with the calculations in the Carter Affidavit, but argue instead that no interest is owed under the Payment Guaranty; if any interest is owed, the Default Rate should not apply; HSH's demands for prejudgment interest and interest on the outstanding principal balance on the Loan are "overlapping"; and HSH's request for attorneys' fees and expenses is unreasonable.  On December 22, HSH submitted a reply to defendants' opposition supported by the affidavit of Justin Kattan, a partner at Sonnenschein, HSH's counsel.


DISCUSSION

The defendants' liability under the Guaranties was determined in the November 23 Opinion, as was the amount owed by defendants under the Principal Guaranty, namely $40 million.  To be determined here are the amounts owed under the Payment Guaranty, as well as the amount of attorneys' fees, expenses, and prejudgment interest to be awarded HSH.

11

1.   Amounts Owed Under the Payment Guaranty

Among other things, the Payment Guaranty obligates the defendants to make "full payment when due of all Operating Expenses."  Under the Loan Agreement, such operating expenses include the protective advances made by HSH to protect the Development Project after the occurrence of the Events of Default.  The Carter Affidavit shows that HSH made a total of $928,770.86 in protective advances after the Loan went into default.  The defendants do not contest the fact that HSH made the protective advances, that they received notice of the protective advances when they were made, or that the amounts set forth in the Carter Affidavit are accurate.  Accordingly, the defendants are liable for $928,770.86 in protective advances pursuant to the Payment Guaranty.

The Payment Guaranty also obligates the defendants to make "full payment when due of all interest on the Loan."  As guarantors of payment, the defendants are liable for all interest charges assessed under the Loan Agreement against the Borrower.  See Pro-Specialties, Inc. v. Thomas Funding Corp., 812 F.2d 797, 800 (2d Cir. 1987) (citing Bryant Park Bldg v. Richmond, 85 N.Y.S.2d 531 (Sup.Ct. 1948)).  Upon acceleration of the Loan in April 2008, all accrued interest became immediately due and owing by the Borrower.  Under the Payment Guaranty, the defendants became liable for this accrued interest when the

Borrower failed to pay.  Defendants are also liable for the interest that continues to accrue at the Default Rate on the outstanding principal balance on the Loan, as well as on the protective advances.  The Carter Affidavit calculates that as of November 30, 2009, the total amount of accrued interest due and owing on the outstanding principal balance on the Loan was $21,623,492.06, and on the protective advances was $142,556.77.

Defendants do not contest the accuracy of the calculations in the Carter Affidavit.  Instead, defendants argue that no interest is due and owing on the Loan because the default was "suspended" during the forbearance period pursuant to the SICA between HSH and Cerberus.[7]  The defendants claim that under the SICA, "interest is no longer treated as interest; it has all been converted to principal -- principal which is not due until maturity in 2013."  The notion that the SICA superseded the Loan Agreement and suspended the default on the Loan, thereby releasing the defendants from their obligations under the Guaranties, was explicitly addressed and rejected in the November 23 Opinion.  See HSH Nordbank, 2009 WL 4042838, at *6.[8]

---

[7] The background and terms of the SICA are discussed in the November 23 Opinion.  See HSH Nordbank, 2009 WL 4042838, at *4-5.

[8] The November 23 Opinion also noted that the Guaranties explicitly provide that HSH, without notice to or further consent of any Guarantor, may

To the contrary, the defendants' obligations under the Guaranties, which must be determined with reference to the Loan Agreement, not the SICA, are in full force and effect. The defendants' argument that they are not obligated to pay the Default Rate during the forbearance period fails for the same reasons. Because the defendants provide no evidence to question the Carter Affidavit's calculation of the amount of accrued interest due and owing on the outstanding principal balance on the Loan and the protective advances, the defendants are liable for $21,766,048.83 in accrued interest under the Payment Guaranty.

---

extend the time of payment of, exchange or surrender any collateral for, or renew any of the Obligations, and may also make any agreement with Borrower or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, discharge, or release thereof, in whole or in part, or for any modification of the terms thereof or of any agreement between Administrative Agent and Borrower or any of such other party or person, without in any way impairing or affecting this Guaranty.

Id. at *3 (emphasis added). The fact that pursuant to the SICA, HSH and the other lenders agreed to forbear from exercising their remedies against the Borrower and agreed to forgo the Default Rate on the Loan during the forbearance period, therefore had no impact on the defendants' obligations under the Guaranties and the Loan Agreement.

2.   Prejudgment Interest

HSH seeks prejudgment interest on the amounts that
defendants should have paid under the Guaranties.  Under New
York C.P.L.R. § 5001, a creditor is entitled to prejudgment
interest on all sums due, as of the date they became due.  N.Y.
C.P.L.R. § 5001; Capital Ventures Int'l v. Republic of
Argentina, 552 F.3d 289, 296 (2d Cir. 2009).  "While awards of
interest are generally discretionary, New York law does not
permit the trial court to exercise any discretion where a party
is entitled to prejudgment interest as a matter of right."
Capital Ventures, 552 F.3d at 296 (citation omitted).

The defendants do not contest HSH's calculations of the
prejudgment interest as set forth in the Carter Affidavit.
Defendants argue instead that HSH's demand for the accrued
interest on the outstanding principal balance on the Loan and
for prejudgment interest on the $40 million portion of the
outstanding principal balance on the Loan that they owe
constitutes "double-dipping."  This argument has been explicitly
rejected by the New York Court of Appeals.  See Spodek v. Park
Prop. Dev. Assocs., 759 N.E.2d 760, 762 (N.Y. 2001) (holding
that "CPLR 5001(a) permits a creditor to recover prejudgment
interest on unpaid interest and principal payments awarded from
the date each payment became due" (emphasis added)).  HSH is
therefore entitled to prejudgment interest on all payments that

defendants should have made under both Guaranties as calculated
in the Carter Affidavit.  The prejudgment interest calculations
shall be adjusted, however, to include the interest that has
accrued since December 5, 2009 through entry of judgment.


3.  Attorneys' Fees and Expenses

    The Guaranties provide that the defendants shall be liable
for "any and all expenses (including reasonable counsel fees and
expenses) incurred by Administrative Agent [HSH] in enforcing
any rights under [the Guaranties]."  The Carter Affidavit
indicates that HSH incurred $2,675,848.83 in attorneys' fees and
$455,857.90 in expenses in connection with the enforcement of
the Guaranties.  The defendants argue that these amounts are
unreasonable and that HSH's request should be reduced by
approximately $1.7 million.

    "Under New York law, a contract that provides for an award
of reasonable attorneys' fees to the prevailing party in an
action to enforce the contract is enforceable if the contractual
language is sufficiently clear."  NetJets Aviation, Inc. v. LHC
Communications, LLC, 537 F.3d 168, 175 (2d Cir. 2008).  "[T]he
rule in New York is that when a contract provides that in the
event of litigation the losing party will pay the attorneys'
fees of the prevailing party, the court will order the losing
party to pay whatever amounts have been expended by the

16

prevailing party, so long as those amounts are not
unreasonable." Diamond D Enterprises USA, Inc. v. Steinsvaag,
979 F.2d 14, 19 (2d Cir. 1992).  Thus, in addressing a
contractual claim for attorneys' fees, a court must determine
what constitutes "a reasonable amount of fees." McGuire v.
Russell Miller, Inc., 1 F.3d 1306, 1313 (2d Cir. 1993).

        In determining the reasonableness of attorneys' fees in the
context of a contractual claim, a court examines a variety of
factors, including "the difficulty of the questions involved;
the skill required to handle the problem; the time and labor
required; the lawyer's experience, ability and reputation; the
customary fee charged . . . for similar services; and the amount
involved." F.H. Krear & Co. v. Nineteen Named Trustees, 810
F.2d 1250, 1263 (2d Cir. 1987) (citation omitted).[9]  It is
appropriate for a court to consider the amount of fees requested
in relation to the amount of damages at stake in the litigation.
Id. at 1264.  With respect to the evaluation of the time and
labor expended on a particular matter, the court looks to "its
own familiarity with the case and its experience with the case

--------

[9] The Second Circuit has issued a series of recent opinions
addressing the award of attorneys' fees in common fund and civil
rights cases.  See, e.g., McDaniel v. County of Schenectady, 595
F.3d 411, 417 (2d Cir. 2010) ("[C]ourts may award attorneys'
fees in common fund cases under either the 'lodestar' method or
the 'percentage of the fund' method." (citation omitted)).  If
those measurements were applied here, the same award of fees
would be rendered.

and its experience generally as well as to the evidentiary
submissions and arguments of the parties." Clarke v. Frank, 960
F.2d 1146, 1153 (2d Cir. 1992) (Title VII case) (citation
omitted).  Counsel are, of course, required to present detailed
contemporaneous billing records.  The court is not, however,
required to "set forth item-by-item findings concerning what may
be countless objections to individual billing items." Lunday v.
City of Albany, 42 F.3d 131, 134 (2d Cir. 1994) (Section 1983
case).  Ultimately, "[w]here a district court has awarded
attorneys' fees under a valid contractual authorization, . . .
it has broad discretion in doing so, and an award of such fees
may be set aside only for abuse of discretion." In re
Goldstein, 430 F.3d 106, 110 (2d Cir. 2005) (citation omitted).
A court may not award fees, however, for the time spent by
counsel seeking those fees.  F.H. Krear, 810 F.2d at 1266.

Based on the circumstances of this case and this Court's
familiarity with the litigation, HSH's fee request is eminently
reasonable.  The approximately $3.1 million in attorneys' fees
and expenses represents less than five percent of the judgment
that shall be entered, a factor which weighs in favor of a
finding of reasonableness.  Although defendants are correct that
this action should have been a straightforward case of contract
interpretation, HSH was required to litigate an array of
affirmative defenses raised by the defendants, even though such

18

defenses were waived by the Guaranties.  The fee is also reasonable given that HSH's counsel was forced to respond to the defendants' broad discovery demands -- to which HSH's counsel objected on several occasions -- which required the review of over two million pages of documents and the production of over 250,000 pages to the defendants.  Further, the parties litigated two discovery disputes and conducted twenty-three depositions, of which eighteen were noticed by the defendants, including at least twelve non-party witnesses.  While the defendants now complain that HSH's counsel did not rely on much of the material uncovered during discovery, this fact merely demonstrates how irrelevant and overly broad the defendants' demands were.

Despite the defendants' contentions to the contrary, the evidence provided by HSH demonstrates that HSH's counsel appropriately staffed this matter, made efficient use of attorney time, and did not duplicate efforts or overbill.  HSH has provided appropriately detailed contemporaneous records of the work performed by HSH's counsel.  With the exception of document review, these records show that HSH's counsel used four attorneys -- one senior partner, one partner, and two associates -- to draft all pleadings, cover all twenty-three depositions, make all court appearances, and draft all of the briefs on the motion for summary judgment.  Any additional attorneys that billed to the matter were needed to perform the document review

conduced in response to the defendants' broad discovery demands.[10]   Furthermore, the staffing on this matter was efficient:  the senior partner billed less than 500 hours; the partner billed approximately 1,000 hours; one associate billed approximately 1,200 hours; and the other associate billed approximately 2,100 hours.  The number of hours billed is reasonable given the nature this litigation, particularly in light of the defendants' assertion of a variety of affirmative defenses, the defendants' broad discovery demands, and the number of depositions taken.  The division of labor among the attorneys was similarly appropriate.  The two most junior attorneys conducted the bulk of the work, including overseeing the document review, conducting the legal research, and writing the initial drafts of pleadings and briefs.  Likewise, the junior partner billed twice the number of hours as the more senior partner.  Notably, the defendants do not attack the hourly rates billed by each attorney, which in any event were reasonable.[11]

---

[10] HSH represents that only one other partner billed more than fifty hours on the matter.  This partner was involved in the drafting of the Loan Documents and was often consulted about the documents during this litigation.

[11] It is also worth noting that the defendants have not disclosed the amount of fees that they paid to their counsel as a benchmark to be used in determining the reasonableness of the attorneys' fees requested by HSH.

The defendants' remaining objections to HSH's request for attorneys' fees and expenses, including those concerning the May 2009 invoice[12], have been carefully considered and are found to be without merit.  In any event, the defendants' remaining objections would have no material impact on HSH's request.[13] HSH's request having been found to be reasonable based on the submissions of the parties, there is no need for an evidentiary hearing, and HSH shall be awarded $3,131,707.73 in attorneys' fees and expenses that it seeks.

## CONCLUSION

HSH's claims for damages under the Payment Guaranty, as well as attorneys' fees, expenses, and prejudgment interest are granted. The defendants' objections and request for an evidentiary hearing are denied.  HSH shall submit a proposed

---

[12] The defendants point to the May 2009 invoice (reflecting April 2009 time) for approximately $500,000 as being particularly excessive.  This invoice is an outlier, however, since during April 2009, HSH's counsel prepared for and took the deposition of defendants' witnesses, prepared and defended the deposition of more than twelve of HSH's witnesses, and reviewed hundreds of thousands of pages of documents from the non-party lenders.

[13] The only possible remaining material objection is the defendants' claim that the approximately $300,000 in fees incurred for "data hosting" performed by an outside e-discovery vendor was unreasonable because of "the small amount of memory required to store the documents."  Defendants provide no evidence to support this contention, and in any event, these costs are directly attributable to the defendants' overly broad document demands.

judgment consistent with the rulings in the November 23 Opinion and this Opinion by March 26, 2010.  Upon entry of judgment, the Clerk of Court shall close the case.

SO ORDERED:

Dated:     New York, New York
           March 24, 2010

_____
          DENISE COTE
United States District Judge